## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| Eileen Yeisley, on behalf of herself and all other similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>University of Iowa Hospitals & Clinics,<br><br>          Defendant. | Case No. 3:23-cv-00025-SHL-HCA<br><br><br>**FIRST AMENDED<br>CLASS ACTION COMPLAINT** |

Plaintiff Eileen Yeisley is a current user of University of Iowa Hospitals & Clinics ("UIHC" or Defendant). She brings this class action against UIHC in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

1.      Plaintiff brings this class action lawsuit to address Defendant's unlawful and widespread unauthorized practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information (PII) and protected health information (PHI) (collectively referred to as Private Information) to third parties, including Meta Platforms, Inc. d/b/a Meta (Facebook).

2.      Defendant manages or controls the two websites www.uihealthcare.org and University of Iowa Hospitals & Clinics ("Defendant's Website"), which it encourages individuals to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes.

1

3.      Defendant installed and implemented the Facebook Tracking Pixel (the Pixel or Facebook Pixel) on its Website, which secretly enables the unauthorized transmission and disclosure of Plaintiff and Class Members' PII and PHI as they are communicated to Defendant.

4.      Based on Defendant's use of the Pixel, and evidence demonstrating that the information transmitted via the Pixel was indeed linked to Plaintiff's personal Facebook account, Plaintiff asserts Defendant also installed and implemented the Facebook Conversion Application Programming Interface (Conversion API) on its Website.

5.      By implementing Conversions API, Defendant secretly enabled additional unauthorized transmissions and disclosures of Plaintiff and Class Members' PII and PHI.[1]

6.      More specifically, Defendant's Websites direct Plaintiff's and Class Members' communications to automatically and surreptitiously be sent to Facebook's servers, and this occurs on every webpage that Defendant has installed the Pixel and Conversions API.[2]

7.      Thus, operating as designed and as implemented by Defendant, the Pixel allows the Private Information that Plaintiff and Class Members submit to Defendant to be

---

[1] "Conversions API works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited: Jan. 25, 2023).

[2] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel . . . This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." https://developers.facebook.com/docs/marketing-api/conversions-api (last visited: January 27, 2023)

unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID (FID).

8.        Similarly, Conversions API stores Plaintiff's and Class Members' Private Information from visiting Defendant's Website and transmits it to Facebook.

*Tracking Pixel*

9.        A pixel is a piece of code that "tracks the people and the types of actions they take"[3] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), and more.

10.        The User's web browser executes the Pixel via instructions within the Defendant's webpage to communicate directly to Facebook certain parameters defined by the Defendant.

11.        The Pixel can share the user's Facebook User ID[4] for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser.[5] Cookies are only transmitted to the owner site from the user's web

---

[3] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Jan. 31, 2023).

[4] The Facebook "User ID is a string of numbers that doesn't personally identify you but does connect to your Facebook profile." A Facebook "User ID [is generated] automatically, whether or not you choose to create username." https://www.facebook.com/help/211813265517027 (last visited: January 27, 2023).

[5] "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to

browser and cannot be accessed by any other site.

12.     The Facebook Pixel is programmable, meaning that the Defendant controls which of its webpages contain the Pixel and which events are tracked and transmitted to Facebook.

13.     Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Upon information and belief, Defendant utilized the Pixel data for marketing purposes in an effort to bolster its profits. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information which is then surreptitiously disclosed to Defendant.

*Conversions API*

14.     The Facebook Conversions API allows businesses and companies to send web events from their servers to Facebook.[6]

15.     The Conversions API is designed to create a direct and reliable connection between marketing data (such as website events and offline conversions) from Defendant's server to Facebook.[7] In doing so, Defendant stores Plaintiff's and Class Members' Private Information on its own server and then transmits it to Facebook from Defendant's server.

---

personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies (last visited: January 27, 2023).

[6] https://revealbot.com/blog/facebook-conversions-api/ (last visited: January 24, 2023).

[7] https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited: January 25, 2023).

16.     The Conversions API is an alternative method of tracking versus the Pixel because no privacy protections on the user's end can defeat it. This is because it is Server-Side implementation versus execution by Users' web browsers.

17.     Because Conversions API is Server-Side, it cannot access the Facebook Cookie to retrieve the Facebook User ID.[8] Therefore, other round-about methods of linking the user to their Facebook account must be employed.[9]

18.     Facebook has an entire page within its developers' website about how to de- duplicate data received when both a Pixel is executed as well as the Conversions API.[10]

19.     Conversions API tracks the user's website interaction, including Private Information, and then transmits this data to Facebook. Indeed, Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."

---

[8] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, email addresses, and phone numbers, that we use for matching purposes only." https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited: January 27, 2023).

[9] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/#req-rec-params (last visited: January 27, 2023).

[10] https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events (last visited: January 27, 2023).

*Purpose of this Lawsuit*

20.     Accordingly, this case arises from Defendant's intentional, reckless, and/or negligent disclosure of Plaintiff's and Class Members' confidential and private medical information to Facebook.

21.     The information that Defendant's Pixel and Conversions API sent to Facebook included the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including for example, the type of medical treatment sought, the particular health condition, and the fact that the individual attempted to or did book a medical appointment. Such Private Information would allow a third party (e.g., Facebook) to know that a specific individual was seeking confidential medical care. This type of disclosure could also allow a third party to reasonably infer that a specific individual was being treated for a specific type of medical condition such as cancer, pregnancy, dementia, or HIV.

22.     Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and Conversions API.

23.     For instance, Plaintiff submitted medical information to Defendant's Website and used the Website to search for a physician, communicate Private Information with her physician, complete patient web forms, and review medical healthcare records.

24.     Shortly thereafter, this information was communicated from Defendant's Website to Facebook.

25.     Defendant regularly encourages Plaintiff and Class Members to use its

digital tools, including its Website, to receive healthcare services. Plaintiff and Class Members provided their Private Information through Defendant's Website with the reasonable understanding that Defendant would secure and maintain any PII and PHI as confidential.

26.     At all times that Plaintiff and Class Members visited and utilized Defendant's Website, they had a reasonable expectation of privacy in the Private Information collected through Defendant's Website, including that it would remain secure and protected and only utilized for medical purposes.

27.     Plaintiff and Class Members provided Private Information to Defendant in order to receive medical services rendered and with the reasonable expectation that Defendant would protect their Private Information. Plaintiff and Class Members relied on Defendant to secure and protect the Private Information and not disclose it to unauthorized third parties without their knowledge or consent.

28.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that individuals exchange with Defendant.

29.     Defendant owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized disclosure.

30.     Defendant, however, failed in its obligations and promises by utilizing the

Facebook Pixel and Conversions API, described below, on its Website, knowing that such technology would transmit and share Plaintiff's and Class Members' Private Information with Facebook.

31.     While Defendant willfully and intentionally incorporated the Pixel and Conversions API into its Website, Defendant has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications via the Website with Facebook. As a result, Plaintiff and Class Members were unaware that their PII and PHI were being surreptitiously transmitted to Facebook as they communicated with their healthcare provider via the Website.

32.     Defendant breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through Facebook Pixels;  (v) failing to warn Plaintiff and Class Members;  and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of individual's PII and PHI.

33.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, (iii) loss of benefit of the bargain, (iv) diminution of value of the Private Information, (v) statutory

damages, and (vi) the continued and ongoing risk to their Private Information.

34.     Plaintiff seeks to remedy these harms and bring causes of action for (i) unjust enrichment; (ii) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*; and (iii) violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

## PARTIES

### *Plaintiff Eileen Yeisley*

35.     Plaintiff is a natural person and citizen of Iowa where she intends to remain. On numerous occasions, Plaintiff accessed Defendant's Website on her mobile device and/or computer. Plaintiff used the Website to find and obtain medical treatment. Pursuant to the systematic process described in this Complaint, Plaintiff's Private Information was intentionally disclosed to Facebook, and this data included her PII, PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's PII and PHI.

36.     Plaintiff has received healthcare services at Defendant's healthcare facilities since the early 1980s and has used Defendant's Website and digital healthcare platforms to communicate Private Information to Defendant on numerous occasions over the last five years.

37.     Plaintiff used Defendant's Website, including the UIHC Webpage, to conduct the following activities: search for physicians, schedule appointments and

procedures, receive and discuss medical diagnoses and treatment from her healthcare providers, receive lab results, and review medical records.

38.     Plaintiff has been a Facebook user since 2009.

39.     Plaintiff accessed Defendant's Website, including the UIHC Webpage, to receive healthcare services from Defendant or Defendant's affiliates, at Defendant's direction, and with Defendant's encouragement.

40.     As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or intercepted by a third party. Plaintiff also relied on Defendant's Privacy Policies and general HIPAA requirements in reasonably expecting Defendant would safeguard her Private Information. But for Defendant's Privacy Policies and Plaintiffs status as Defendant's patient, she would not have disclosed her Private Information to Defendant.

41.     During her time as a patient, Plaintiff never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook, to access or interpret such information.

42.     Notwithstanding, through the Pixel and Conversions API, Defendant transmitted Plaintiff Private Information to third parties, such as Facebook and Google.

### Defendant University of Iowa Health Care

43.     Defendant University of Iowa Hospitals & Clinics is headquartered at 200 Hawkins Drive, Iowa City, IA 52242. Defendant presents itself as providing "world class family-centered health care, extensive medical research, and comprehensive teaching

programs for many health care professions.[11] "With more than 250 specialty and subspecialty clinics, UI Hospitals & Clinics offers the most comprehensive health care in the state." Defendant employs over 11,200 individuals, including over 1,100 staff physicians and dentists, nearly 800 resident and fellow physicians, and more than 5,000 nursing staff members.

44.     Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

45.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

46.     This Court has federal question jurisdiction under 29 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (28 U.S.C. § 2511, *et seq.*, and 28 U.S.C. § 2702) and the CFAA (18 U.S.C. § 1030, *et seq.*).

47.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

48.     Venue is proper under 18 U.S.C. § 1391(b)(1) because Defendant's

---

[11] https://uihc.org/about-us.

principal place of business is in this District.

## COMMON FACTUAL ALLEGATIONS

**A. Background: Underlying Technology Employed by Defendant for the Purpose of Disclosing Plaintiff and Class Members' Private Information to Facebook.**

49.     Defendant purposely and intentionally installed the Pixel and Conversions API tools on its webpages within its Website, and it programmed those webpages to surreptitiously share its potential and current users' private and protected communications with Facebook, including communications that contain Plaintiff's and Class Members' PHI and PII.

50.     Defendant uses the Website to connect Plaintiff and Class Members to Defendant's digital healthcare platforms with the goal of increasing profitability.

51.     In order to understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

### *i.   Facebook's Business Tools and the Pixel.*

52.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[12]

53.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools"

---

[12] Facebook, *Meta Reports Fourth Quarter and Full Year 2021 Results*, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

to gather, identify, target, and market products and services to individuals.

54.     Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

55.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[13] Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[14]

56.     One such Business Tool is the Pixel, which "tracks the people and type of actions they take."[15] When a user accesses a webpage that is hosting the Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling from the user's browser to Facebook's server.

57.     Notably, this transmission only occurs on webpages that contain the Pixel.

---

[13] Facebook, Specifications for Facebook Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last visited Jan. 31, 2023); *see* Facebook, Facebook Pixel, Accurate Event Tracking, Advanced, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also Facebook, Best Practices for Facebook Pixel Setup, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; Facebook, App Events API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).

[14] Facebook, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* Facebook, *App Events API*, *supra*.

[15] Facebook, *Retargeting*, https://www.facebook.com/business/goals/retargeting.

Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook but for Defendant's decisions to install the Pixel on its Website.

58.     Similarly, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via Conversions API but for Defendant's decision to install and implement that tool on its Website.

59.     By installing and implementing both tools, Defendant caused Plaintiff's and Class Member's communications to be intercepted and transmitted to Facebook via the Pixel, and it caused a second improper disclosure of that information via Conversions API.

60.     As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

> **ii.  *Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Pixel and/or Conversions API (i.e., the interplay between HTTP Requests and Responses, Source Code, and the Pixel).***

61.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet, or smart phone) accessed web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

62.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

63.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL (for instance, uploading a PDF for filing a motion to a court).

- **Cookies**: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[16]

64.     An individual's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as a physician's "Book an Appointment" page). The

---

[16] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the individual's screen as they navigate Defendant's Website.

65.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

66.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  Defendant's Pixel is source code that does just that.  The Pixel acts much like a traditional wiretap.  When individuals visit Defendant's website via an HTTP Request to UIHC' server, Defendant's server sends an HTTP Response including the Markup that displays the Webpage visible to the user and Source Code including Defendant's Pixel.  Thus, Defendant is, in essence, handing individuals a tapped phone, and once the Webpage is loaded into the individual's browser, the software- based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third-parties, including Facebook.

67.     Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services.  These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the individual associated with the Private Information intercepted.

68.     With  substantial  work  and  technical  know-how,  internet  users  can

sometimes circumvent this browser-based wiretap technology.  This is why third parties bent on gathering Private Information, like Facebook, implement workarounds that savvy users cannot evade.  Facebook's workaround, for example, is called Conversions API. Conversions API is an effective workaround because it does the transmission from their own servers and does not rely on the User's web browsers. Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."[17] Thus, the communications between individuals and Defendant, which are necessary to use Defendant's Website, are actually received by Defendant and stored on its server before Conversions API collects and sends the Private Information contained in those communications directly from Defendant to Facebook.  Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

69.     While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like Conversions API without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[18]  Thus, it is reasonable to infer that Facebook's customers who implement the Facebook Pixel in accordance with Facebook's documentation will also

---

[17] Facebook, *Prepare your Business to Use the Conversions API*,
https://www.facebook.com/business/help/1295064530841207?id=818859032317965
(last accessed Jan. 31, 2023).
[18] *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965
(last visited Jan. 23, 2023).

implement the Conversions API workaround.

70.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications.  Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

71.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

72.     In this case, Defendant employed the Pixel and Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook.

73.     For example, when an individual visits https://uihc.org/services and selects "Heart and Vascular Services," the patient's browser automatically sends an HTTP Request to Defendant's web server.  Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage as depicted below.





*Figure 1 Image taken from https://uihc.org/services/heart-and-vascular-services.*

74.     The individual visiting this particular web page only sees the Markup, not the Defendant's Source Code or underlying HTTP Requests and Responses.

75.     In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[19] effectively open a spying

---

[19] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware

window through which the webpage can funnel the visitor's data, actions, and communications to third parties.

76.     Looking to the previous example, Defendant's Source Code manipulates the individual's browser by secretly instructing it to duplicate the individual's communications (HTTP Requests) and send those communications to Facebook.

77.     This occurs because the Pixel embedded in Defendant's Source Code is programmed to automatically track and transmit individuals' communications, and this occurs contemporaneously, invisibly, and without the individual's knowledge.

78.     Thus, without each individuals' consent, Defendant has effectively used its Source Code to commandeer the individuals' computing devices, thereby re-directing their Private Information to third parties.

79.     The information that Defendant's Pixel sends to Facebook may include, amongst other things, the individuals' Private Information, and other confidential information.

80.     Consequently, when Plaintiff and Class Members visit Defendant's website and communicate their Private Information, it is transmitted to Facebook, including, but not limited to, appointment type and date, physician selected, specific button/menu selections, content typed into free text boxes, demographic information, email addresses, phone numbers, and emergency contact information.

**B. Defendant's Pixel and/or Conversions API Tracking Practices caused Plaintiff's and Class Members' Private Information to be sent to Facebook.**



of them.

81.     Defendant utilizes Facebook's Business Tools and intentionally installed the Pixel and Conversions API on its Website to secretly track individuals by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.[20]

82.     Defendant's Website contains a unique identifier that indicates that the Pixel is being used on a particular webpage, identified as 7366111505820508.

83.     The Pixel allows Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.[21] However, Defendant's Website does not rely on the Pixel in order to function.

84.     While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

85.     Plaintiff and Class Members were not aware that their Private Information would be shared with Facebook as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

86.     Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to Facebook, nor did they intend for Facebook to be a party to their communications with Defendant.

87.     Defendant's Pixel and Conversions API sent non-public Private

---

[20] *Id.*

[21] *Id.*

Information to Facebook, including but not limited to Plaintiff's and Class Members': (1) status as medical patients; (2) health conditions; (3) sought treatment or therapies; (4) appointment requests and appointment booking information; (5) registration or enrollment in medical classes (such as breastfeeding courses); (6) locations or facilities where treatment is sought; (7) which webpages were viewed; and (8) phrases and search queries conducted via the general search bar.

88.     Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individuals' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts.[22]

89.     A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

90.     Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented technology (i.e., the Facebook Pixel and Conversions API) that

---

[22] Defendant's Website track and transmit data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

surreptitiously tracked, recorded, and disclosed Plaintiff's and other online individuals' confidential communications and Private Information; (2) disclosed individuals' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

> **i. Defendant's Pixel Disseminates Personal Information via www.uihc.org.**

91.     An example illustrates the point. If an individual uses www.uich.org to book an appointment with a cardiologist, Defendant's Webpage directs them to a series of screens that ask the individual to communicate additional information. Unbeknownst to the individual, each and every communication is sent to Facebook via Defendant's Pixel, as evidenced by the images below.

92.     In order to book an appointment, the user visits www.uich.org and clicks the "services" button.



93.    Next, Defendant directs the user to select from a list of "featured services" or search for all services.







94.     The user then selects the "request an appointment" button, whereafter Defendant invites the user to schedule online and provide contact information, patient information, and insurance information.







95.    Without alerting the user, Defendant's Pixel sends each and every

communication the user made to the Defendant via the Webpage to Facebook, and the image below confirms that the communications Defendant sends to Facebook contain the user's Private Information.



96.     The third line of highlighted text, "id=736611150582050," refers to the Defendant's Pixel ID for this particular Webpage and confirms that the Defendant has downloaded the Pixel into its Source Code on this particular Webpage.

97.     The remainder of that third line of text identifies and categorizes which

actions the user took on the Webpage (e.g., "heart-and-vascular-services," "vascular%20disease"). Thus, this identifies the user as having viewed the particular Webpage.

98.    The remaining lines of text identify: (1) the user as a patient seeking medical care from Defendant via www.uihc.org; (2) who is in the process of booking an appointment or searching for medical treatment; (3) whether appointment is for herself as opposed to someone else (appearing as "who=me" in the text above); and (4) the appointment is with an "heart%20and%20vascular%20services" (aka the "reason" for the appointment);

99.    Finally, the second line of highlighted text ("GET"), demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user = ID).[23]

---

[23] The user's Facebook ID is represented as the c_user ID highlight in the image above, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.

**ii. Plaintiff has Specific Evidence of Defendant's Tracking Pixel Communicating with Facebook regarding her Private Information.**

100. Plaintiff submitted PHI to Defendant via the Website. Because Defendant utilizes the Facebook Pixel, the Website's Source Code sends a secret set of instructions back to the individual's browser, causing the Pixel to send Plaintiff's FID, the Pixel ID, and the webpage's URL to Facebook. For instance, when Plaintiff visited Defendant's webpage for a medical condition, the Facebook Pixel reports back the Plaintiff's FID as well as the web page and other data specified by Defendants secretly to Facebook.

101. Accordingly, during the same transmissions, the Website routinely provide Facebook with its users' FIDs, IP addresses, and/or device IDs or other the information they input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients.[24] Plaintiff's and Class Members identities could be easily determined based on the FID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

102. After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that

---

[24] https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Nov. 14, 2022)

it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

103.    In sum, Defendant's Pixel transmitted Plaintiff's highly sensitive communications and Private Information to Facebook, including communications that contained Private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

104.    Defendant breached Plaintiff's right to privacy and unlawfully disclosed her Private Information to Facebook. Specifically, Plaintiff had a reasonable expectation of privacy, based on Defendant's Privacy Policy and her status as Defendant's patient and/or potential patient, that Defendant would not disclose her Private Information to third parties.

105.    Defendant did not inform Plaintiff that it shared her Private Information with Facebook and other unauthorized third parties.[25] Moreover, Defendant's privacy

---

[25] Defendant also shares Plaintiff's and Class Members Private Information with Google Analytics (analytics.google.com) which allows Defendant to leverage its Website visitor's traffic to "[a]dvertise more effectively by linking your Ads account to Analytics." *See* https://analytics.withgoogle.com/?utm_source=google-

policy does not state that its patients' Private Information will be shared with Facebook or other unauthorized third parties without prior written consent.

106.     By doing so without Plaintiff's consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed Plaintiff's Private Information.

107.     Upon information and belief, as a "redundant" measure to ensure Plaintiff's Class Members' Private Information was successfully transmitted to third parties like Facebook, Defendant implemented server-based workarounds like Conversions API to send Plaintiff's and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook.

108.     Plaintiff suffered damages in the form of (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the invasion of privacy; (iii) diminution of value of the Private Information; (iv) statutory damages; (v) the continued and ongoing risk to her Private Information; and (vi) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Website.

109.     Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

---

growth&utm_medium=cpc&utm_campaign=2019-q4-amer-all-gafree-analytics&utm_content=analytics&gclid=CjwKCAjwiOCgBhAgEiwAjv5whBGXXTuuj OX3sdbwNHkoDKGwKp8MZSuno8yu8yQ3-Zor5EEDdct6sRoCuZoQAvD_BwE&gclsrc=aw.ds (last visited March 6, 2023).

## C. Defendant's Conduct is Unlawful and Violates its Patients' Rights.

### *i. Defendant's Conduct Violates its Own Privacy Policies and Promises.*

110.     Defendant's privacy policies represent to Plaintiff and Class Members that Defendant will keep Private Information private and confidential and they will only disclose Private Information under certain circumstances.[26]

111.     Defendant publishes several privacy policies that represent to patients and Website visitors that Defendant will keep sensitive information confidential and will only disclose PII and PHI under certain circumstances, none of which apply here.

112.     Defendant's privacy policy explains Defendant's legal duties with respect to Private Information and the exceptions in which Defendant can lawfully use and disclose Plaintiff's and Class Members' Private Information, including:

- Follow the law;

- Help with public health and safety issues;

- Respond to organ and tissue donation requests;

- Work with a medical examiner or funeral director

- Handle workers' compensation;

- Respond to lawsuits and legal actions; and

- With your written permission

113.     Defendant's HIPAA Notice of Privacy Practices does not permit Defendant to intercept, transmit, and/or disclose Plaintiff's and Class Members' Private Information

---

[26] https://uihealthcare.org/privacy-policy (last visited: February 10, 2023).

to third parties, including Facebook, *for marketing purposes* and will only make these disclosures with written authorization.[27]

114.     Defendant violated its own Privacy Policy by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to Facebook and third parties for marketing purposes without adequately disclosing that it shares Private Information with third parties for those purposes and without acquiring the specific patients' consent or authorization. Furthermore, as required by Defendant's own HIPAA Notice of Privacy Practices, it is "required by law [that UIHC] notify you of a breach of your unsecured medical information" without unreasonable delay but in no case later than 60 days after we discovery the breach."[28] Defendant has provided no such notice.

### ii. Defendant Violated HIPAA Standards

115.     Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[29]

116.     Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

117.     In Guidance regarding Methods for De-identification of Protected Health

---

[27] https://uihc.org/hipaa-notice-privacy-practices-english (last accessed March 7, 2023).

[28] *Id.*

[29] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

Information in Accordance with the Health Insurance Portability and Accountability Act

Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[30]

118.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[31]

119.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of

Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of

HIPAA-covered entities and business associates ("regulated entities") under the HIPAA

Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online

tracking technologies ("tracking technologies").[32]

---

[30] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited March 10, 2023).

[31] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Nov. 3, 2022)

[32] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-

120.     The Bulletin expressly provides:

The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI).  Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**  For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

121.     HHS Privacy Bulletin (internal citations omitted) (emphasis in original).[33]

122.     The HHS Privacy Bulletin also identifies several harms that may result from an impermissible disclosure of an individual's PHI, including:

identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.  While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.

HHS Privacy Bulletin (internal citations omitted) (emphasis in original).[34]

123.     According to HHS, HIPAA "[r]egulated entities disclose a variety of

---

tracking/index.html.

[33] *Id.*

[34] *Id.*

information to tracking technology vendors through tracking technologies placed on a regulated entity's website, including individually identifiable health information that the individual provides when they use regulated entities' websites." The information an individual provides may include a medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code.[35]

124.    All of the above listed information that is collected on a regulated entity's website, like Defendant's websites, is PHI, "even if the individual does not have an existing relationship with the regulated entity and even if the [information], such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services." When a regulated entity, again like Defendant, collects the individual's information, that information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[36]

125.    In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Facebook Pixel.

### iii. Defendant Violated Iowa Public Policy.

126.    Iowa has a strong and clearly defined public policy in favor of protecting the

---

[35] *Id.*

[36] *Id.*

privacy of individuals' health information.

127.     In its statute establishing a state health information network, the Iowa General Assembly declared that "[a]ll health information technology efforts shall endeavor to . . . protect the privacy of individuals and the confidentiality of individual's [health] information."[37]

128.     Likewise, Iowa courts have recognized the important public policy of protecting the privacy of individuals' health information.[38]

129.     Defendant violated this public policy by implementing the Facebook Pixel.

### iv. Defendant Violated Industry Standards.

130.     A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

131.     The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

132.     AMA Code of Ethics Opinion 3.1.1 provides: "Protecting information gathered in association with the care of the patient is a core value in health care . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy)."

133.     AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient

---

[37] Iowa Code § 135D.3(1)(d); *see also* Iowa Code § 228.2 (prohibiting disclosure of mental health information).

[38] *See, e.g.*, *In the Interest of A.M.*, 856 N.W.2d 365, 377–78 (Iowa 2014) (discussing the public policy favoring mental health patients' right to privacy).

is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

134.     AMA Code of Medical Ethics Opinion 3.3.2 provides: "Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must: . . . (c ) release patient information only in keeping ethics guidelines for confidentiality."

### v.    Plaintiff's and Class Members' Expectation of Privacy.

135.     Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

136.     Indeed, at all times, when Plaintiff and Class Members provided their PII and PHI to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

### vi.    IP Addresses are Personally Identifiable Information.

137.     On information and belief, through the use of the Facebook Pixel on the Defendant's Website, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

138.     An IP address is a number that identifies the address of a device connected to the Internet.

139.     IP addresses are used to identify and route communications on the Internet.

140.     IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

141.     Facebook tracks every IP address ever associated with a Facebook user.

142.     Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

143.     Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

144.     Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

### vii.  Defendant was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures.

145.     The sole purpose of the use of the Facebook Pixel on Defendant's Website was marketing and profits.

146.     In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on its platform.

147.     Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

148.     By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

149.     On information and belief, Defendant's financial affairs are at least in part independent from those of the State of Iowa because Defendant is funded, in substantial part, by the revenue it receives for its services—including any revenue and/or saved costs stemming from the use of the Facebook Pixel.[39]

150.     On information and belief, the decision to use the Facebook Pixel on the Website was made exclusively by Defendant's staff for the purpose of increasing its own revenue and/or cutting its own costs, and was in no way informed or controlled by any elected or appointed official or body of the government of the State of Iowa.

151.     In light of the foregoing, on information and belief, any judgment against

---

[39] *See* Iowa Code § 263.18(2).

Defendant would be paid out of its own finances and not state coffers.

## TOLLING

152.     Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Facebook because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

153.     Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

154.     The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent as a result of using Defendant's Website (the National Class).

155.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

156.     Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

157.     <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1). The National Class members are so numerous that joinder of all members is impracticable. Upon information and belief,

there are over one million individuals whose PII and PHI may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

158.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    a.  Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

    b.  Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

    c.  Whether Defendant violated its privacy policy by disclosing the PII and PHI of Plaintiff and Class Members to Facebook and/or additional third parties.

    d.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

    e.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

    f.  Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PII and PHI;

    g.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

    h.  Whether Defendant violated the consumer protection statutes asserted as claims in this Complaint;

    i.  Whether Plaintiff and Class Members are entitled to actual, consequential,

and/or nominal damages as a result of Defendant's wrongful conduct;

j.   Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

k.   Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

l.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

159.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

160.   <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

161.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class

Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

162.     <u>Policies Generally Applicable to the Class</u>. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

163.     The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to

which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

164.     The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

165.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

166.     Unless a classwide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

167.     Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

168.     Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's privacy policy;

c. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

169.    Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

## COUNT I:
## UNJUST ENRICHMENT
### (On behalf of Plaintiff and the National Class)

170.    Plaintiff repeats and re-alleges each and every allegation contained in the

Complaint as if fully set forth herein.

171.    Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

172.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

173.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

174.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Iowa and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

175.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT II:**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA") 18 U.S.C. § 2511(1), *et seq.***
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the National Class)**

176.     Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

177.     The ECPA protects both sending and receipt of communications.

178.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

179.     The transmissions of Plaintiff's PII and PHI to Defendant via Defendant' Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

180.     **Electronic Communications**. The transmission of PII and PHI between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

181.     **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

182.     **Interception.** The ECPA defines the interception as the "acquisition of the

48

contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

183.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device . . . which can be used to intercept a[n] . . . electronic communication." 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's web-servers; and

    d.  The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

184.    By utilizing and embedding the Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

185.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Facebook.

186.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

187.     By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

188.     By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

189.     **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State, including invasion of privacy, among others.

190.     Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel and Conversions API to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

191.     Defendant was not acting under color of law to intercept Plaintiff and the Class Member's wire or electronic communication.

192.     Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

193.     Any purported consent that Defendant received from Plaintiff and Class

Members was not valid.

194.     In sending and in acquiring the content of Plaintiff's and Class Members'
communications relating to the browsing of Defendant's Website, Defendant's purpose
was tortious and designed to violate federal and state legal provisions, including as
described above the following: (1) a knowing intrusion into a private, place, conversation,
or matter that would be highly offensive to a reasonable person; and (2) violation of Minn.
Stat. § 325D.44, subd. 1.

## COUNT III:
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (CFAA) 18 U.S.C. § 1030, *et seq.*
### (On Behalf of Plaintiff and the National Class)

195.     Plaintiff repeats and re-alleges each and every allegation contained in the
Complaint as if fully set forth herein.

196.     The Plaintiff's and the Class Members' computers and/or mobile devices
are, and at all relevant times have been, used for interstate communication and commerce,
and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

197.     Defendant exceeded, and continues to exceed, authorized access to the
Plaintiff's and the Class Members' protected computers and obtained information thereby,
in violation of 18 U.S.C. §§ 1030(a)(2), 1030(a)(2)(C).

198.     For example, Defendant exceeded its unauthorized access because
Defendant accessed Plaintiff's and Class Members' Private Information under false
pretenses, i.e., Defendant did not disclose it was transmitting Private Information to
Facebook.

199.     Moreover, Defendant exceeded its unauthorized access because Defendant violated its own Privacy Policies in disclosing Plaintiff's and Class Members' Private Information to Facebook.

200.     Defendant's conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), inter alia, because of the secret transmission of Plaintiff's and the Class Members' private and personally identifiable data and content – including the Website visitor's electronic communications with the Website, URLs of web pages visited, and/or other electronic communications in real-time which were never intended for public consumption.

201.     Defendant's conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV) due to the Private Information of Plaintiff and the Class being made available to Defendant, Facebook, and/or other third parties without adequate legal privacy protections.

202.     Accordingly, Plaintiff and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.     For an Order certifying the National Class and Iowa Subclass and appointing Plaintiff and Counsel to represent such a Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful

conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.       For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.       For an award of damages, including, but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.       For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.       For prejudgment interest on all amounts awarded; and

G.       Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demand that this matter be tried before a jury.


Date: November 15, 2023                    Respectfully Submitted,

**SHINDLER, ANDERSON, GOPLERUD & WEESE P.C.**

/s/ Brian O. Marty
Brian O. Marty
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel: (515) 223-4567
Fax: (515) 223-8887
marty@sagwlaw.com

Daniel E. Gustafson (admitted pro hac vice)
David A. Goodwin (admitted pro hac vice)
Joseph E. Nelson*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
jnelson@gustafsongluek.com

Brian C. Gudmundson (admitted pro hac
vice)
Hart L. Robinovitch*
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
hart.robinovitch@zimmreed.com

Nathan D. Prosser (admitted pro hac vice)
**HELLMUTH & JOHNSON PLLC**
8050 West 78th Street
Edina, MN 55439
Phone: (952) 522-4291
nprosser@hjlawfirm.com

Aaron N. Halstead*
Aaron J. Bibb (admitted pro hac vice)
**HAWKS QUINDEL S.C.**
409 East Main Street
Madison, WI 53703
Phone: (608) 257-0040
ahalstead@hq-law.com
abibb@hq-law.com

Nicholas A. Migliaccio*
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E., Suite 302
Washington, D.C. 20002

54

Phone: (202) 470-3520
nmigliaccio@classlawdc.com

Scott David Hirsch (admitted pro hac vice)
**SCOTT HIRSCH LAW GROUP PLLC**
6810 N. State Road 7
Coconut Creek, FL 33073
Tel: (561) 569-7062
scott@scotthirschlawgroup.com


*pro hac vice forthcoming

**Attorneys for Plaintiff and Class Members**