IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| EILEEN YEISLEY, on behalf of herself and all others similarly situated, | Case No. 3:23-cv-00025-SHL-HCA |
| Plaintiff, | |
| vs. | **BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |
| UNIVERSITY OF IOWA HOSPITALS & CLINICS, | |
| Defendant. | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 2

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD.......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

   I.  UIHC is an arm of the State of Iowa.......................................................................... 5

      A.  UIHC's organizational and supervisory structure shows it is an instrumentality of the State of Iowa. ...................................................................................................... 6

      B.  The State of Iowa exerts significant control over UIHC. .......................................... 10

      C.  The State of Iowa is responsible for UIHC settlements and judgments, UIHC receives state appropriations, and UIHC's strong financial position does not overwhelm all other sovereignty factors.................................................................. 13

      D.  UIHC is sovereignly immune from Yeisley's claims. ................................................ 16

   II.  Yeisley's Amended Complaint fails to state a claim. ...................................................... 16

      A.  Count I fails because UIHC was not unjustly enriched. ............................................. 16

      B.  Count II fails because UIHC was a party to the communication................................ 17

      C.  Count III fails because UIHC accessed only information that Yeisley willingly provided to it. ....................................................................................................... 19

CONCLUSION.................................................................................................................... 21

**INTRODUCTION**

Plaintiff Eileen Yeisley brings two federal statutory claims and an unjust enrichment claim against the University of Iowa Hospitals and Clinics (UIHC), alleging the state university's hospital wiretapped and hacked her when it installed Facebook Pixel on certain pages of its website. After initial motion practice, this Court found that neither statute abrogated state sovereign immunity, nor could the State be sued for unjust enrichment in federal court. Dkt. 31., at 9–16. As a result, this Court dismissed the suit. *Id.* Yet rather than dismiss with prejudice, this Court granted Yeisley leave to replead and assert "additional factual allegations to support her position that UIHC is not an arm of the State." *Id.* at 8.

Yeisley has now repleaded, adding just three paragraphs of allegations to her Complaint that she asserts renders UIHC an independent entity—all of which are based "on information and belief." Dkt. 34, Am. Compl. ¶¶ 149–151. But none of the three allegations undermine UIHC's status as a state instrumentality.

Under the *Greenwood* factors, UIHC is an arm of the State. First, UIHC's characteristics and powers show it is a component of the State University of Iowa, a Board of Regents institution, and provides vital health services to the citizens of Iowa. Second, UIHC is subject to substantial state control. UIHC's operations, policies, purchasing, property, employment, labor, and contract interests and abilities are all subject to state law and controlled by the Board of Regents, with additional oversight by the Iowa Legislature and Auditor of State. And the legislature has circumscribed how UIHC may spend its revenue and mandated that it treat certain classes of patients. Third, and most significantly, the State regularly pays claims arising out of UIHC's alleged common law and statutory violations, just like this suit. So Yeisley's suit indeed implicates state funds, UIHC is an arm of the State, and her claims are barred by the Eleventh Amendment.

In any event, Yeisley failed to plead a viable claim. Yeisley's wiretapping, hacking, and unjust enrichment claims are facially unviable, so this action should be dismissed in its entirety with prejudice.

**BACKGROUND**

"UIHC is part of the state-owned University of Iowa and under the control of the Iowa Board of Regents." Dkt. 31, at 1. UIHC promotes the health of the citizens of Iowa by serving "as the teaching hospital and comprehensive health care center for the State of Iowa." UI Policy Manual § I.2.3(13)(b).[1] UIHC supports health care professionals and organizations in Iowa and other states by offering a broad spectrum of clinical services to its patients; serving as the primary teaching hospital for the University of Iowa; and providing a base for innovative research to improve health care. *Id.* To that end, the Amended Complaint alleges that UIHC "employs over 11,200 individuals, including over 1,100 staff physicians and dentists, nearly 800 resident and fellow physicians, and more than 5,000 nursing staff members." Am. Compl. ¶ 43.

UIHC maintains two websites: uihc.org and uihealthcare.org. *Id.* ¶¶ 2, 73. According to the Amended Complaint,[2] these UIHC websites allow "booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, [and] signing up for events and classes." *Id.* ¶ 2.

The Amended Complaint alleges that, to improve the efficiency of its advertising, UIHC installed a piece of software known as the "Facebook Pixel" on certain pages of those websites. *Id.* ¶¶ 3, 146. According to the Amended Complaint, the Facebook Pixel sends certain information to Facebook's servers about a user's interactions (*e.g.*, a link the user clicks) on each page where the Pixel is installed. *Id.* ¶ 6. If a person happens to access their Facebook account from the same browser they used to access the pages of the UIHC website with the Pixel installed, the Amended Complaint says, Facebook may be able to connect the user's actions on the website with the user's Facebook account. *Id.* ¶ 11.

The Amended Complaint, however, remains notably coy about *which* pages on the UIHC website the Facebook Pixel was supposedly installed. Although the Amended Complaint includes

---

[1] https://opsmanual.uiowa.edu/governance/university-iowa.

[2] For purposes of this motion, the facts alleged in the Amended Complaint are presumed true. *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 445 (8th Cir. 2023). But this Court owes no deference to the Amended Complaint's conclusory assertions or legal conclusions. *Id.* at 446–47.

screenshots from various pages on the UIHC websites, *see id.* ¶¶ 92-94, as well as an image of information supposedly sent to Facebook via the Pixel, *id.* ¶ 95, the Amended Complaint does not allege that the information in that image came from any of the pages pictured in the Amended Complaint. Instead, the Amended Complaint employs careful wording and omissions to *insinuate* (without saying outright) that the Pixel transmits to Facebook all interactions with UIHC's websites, including "content typed into free text boxes," *id.* ¶ 80, which may reflect "medical symptoms . . . medical conditions and treatment options," *id.* ¶ 2.

Yeisley filed this Amended Complaint maintaining that UIHC is liable to Yeisley (and every other person who ever used UIHC's websites) for $5,000 in statutory damages. *See id.* ¶ 200. But for the reasons below, there is no path forward for her claims.

## LEGAL STANDARD

A complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted" or if the court "lack[s] subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1), (6). To survive a 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plausibility requires a plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not shown – that the pleader is entitled to relief." *Edwards v. City of Florissant*, 58 F.4th 372, 377 (8th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 679) (alteration in original). The court does not have to accept legal conclusions, "and [a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

When resolving a jurisdictional challenge, "the district court may look outside the pleadings and weigh evidence" when necessary. *Two Eagle v. United States*, 57 F.4th 616, 620 (8th Cir. 2023). This Court may take judicial notice of information that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Public records, including university policies and procedures, are routinely subject to judicial notice. *See, e.g.*, *Daniel v. Am. Bd. of Emergency Medicine*, 988 F. Supp. 127, 152–81 (W.D.N.Y. 1997),  *Flor v. Bd. of Regents of Univ. of New Mexico*, 539 F. Supp. 3d 1176, 1181 ns.5–6 (D.N.M. 2021).

## ARGUMENT

Yeisley's Amended Complaint does not, and cannot, show that UIHC is anything other than a state instrumentality. Accordingly, UIHC again moves to dismiss this suit because (1) UIHC is an arm of the State of Iowa and entitled to Eleventh Amendment immunity, and (2) none of Yeisley's claims are colorable.

### I.     UIHC is an arm of the State of Iowa.

To begin, "[m]ost appellate courts to have considered the issue have concluded that hospitals affiliated with state-owned universities are protected by sovereign or eleventh amendment immunity." Dkt. 31, at 4. Indeed, courts have thus far uniformly treated the Iowa Board of Regents and institutions under its control, including the University of Iowa, as an arm of the State. *See Myers v. Iowa Board of Regents*, 30 F.4th 705, 710 (8th Cir. 2022); *Brine v. Univ. of Iowa*, 90 F.3d 271, 275 (8th Cir. 1996); *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 20–23 (Iowa 2014); *Jones v. Univ. of Iowa*, 863 N.W.2d 127, 141–42 (Iowa 2013); *Gannon v. Bd. of Regents*, 692 N.W.2d 31, 43–44 (Iowa 2005); *Papadakis v. Iowa State Univ. of Sci. & Tech.*, 574 N.W.2d 258, 260 (Iowa 1997). In light of this authority, and because UIHC is part of the University of Iowa and a Regents institution, UIHC should also be conclusively considered an arm of the State. *See, e.g.*, *Dillion v. Univ. Hosp.*, 715 F. Supp. 1384, 1386–87 (S.D. Ohio 1989) (finding  University of Cincinnati to be an arm of Ohio, and thus hospital component of the

university was likewise an arm of the state); *Hontz v. State*, 714 P.2d 1176, 1180 (Wash. 1986) (finding medical center to be an arm of Washington because the hospital "is operated and managed by the University of Washington and all of its employees are employees of the University").

Still, even considering the question in the first instance and on "the basis of [UIHC's] own particular circumstances," UIHC is entitled to Eleventh Amendment immunity. *Greenwood v. Ross*, 778 F.2d 448, 453 (8th Cir. 1985) (quoting *Soni v. Bd. of Trustees*, 513 F.2d 347, 352 (6th Cir. 1975)). The Eighth Circuit has set out factors for consideration in assessing whether an entity is an arm of the state, including (1) the nature the entity's powers and characteristics under state law; (2) the degree of autonomy and control over its own affairs that the entity enjoys from the State; and (3) the nature of the entity's finances and whether a judgment against the entity would be paid from state funds. *See Pub. Sch. Ret. Sys. Of Mo.*, 640 F.3d at 829; *Greenwood*, 778 F.2d at 453. A fulsome application of those factors shows UIHC is an arm of the State of Iowa.

## A. UIHC's organizational and supervisory structure shows it is an instrumentality of the State of Iowa.

The Iowa Constitution created the State University of Iowa. *See* Iowa Const. art. IX, § 11. UIHC is a component of the University of Iowa, parallel to other substantial university enterprises like research and athletics.[3] The Vice President of Medical Affairs ("VPMA")—who leads UI Healthcare, including UIHC—reports directly to the University President, who in turn reports to the Board of Regents. UI Policy Manual, § I.3.2; Iowa Admin. Code r. 681-12.4. Depending on the activity, the VPMA may also be "directly responsible to the Board of Regents, State of Iowa, or Provost." *Id.*

The Board of Regents is a state agency created by the legislature to govern Iowa's public higher education institutions. *See* Iowa Code § 262.1. The Board of Regents is a nine-member

---

[3] *See* Iowa Admin. Code r. 681-12.3(2) ("A detailed listing of the university's administrative units is shown on the organizational chart at the following website: opsmanual. uiowa.edu/governance/university-iowa/organizational-charts-and-mission-statements."); University of Iowa Organizational Chart, https://opsmanual.uiowa.edu/sites/opsmanual.uiowa.edu /files/wysiwyg_uploads/a01ui.pdf; University of Iowa Hospitals and Clinics Organizational Chart, https://opsmanual.uiowa.edu/sites/opsmanual.uiowa.edu/files/wysiwyg_uploads/a10uihc.pdf.

public body whose members are appointed by the Governor and confirmed by the Senate. *Id.* §§ 262.1, 262.2. Members may be removed for cause by the Governor, again subject to Senate approval. *Id.* § 262.4. The Board of Regents has rulemaking authority "for admission to and for the government of" its institutions. *Id.* § 262.9(3).

The Board of Regents is expressly tasked with governing the "state university of Iowa, including the university of Iowa hospitals and clinics." *Id.* § 262.7(1). As part of its UIHC governance, the Board of Regents created a "University of Iowa Hospitals and Clinics Committee," which is specifically tasked with (1) "[p]roviding strategic direction and focus to the UIHC," (2) "[f]ostering cooperation and coordination with open communication and input from multiple constituencies," (3) "[e]valuating and providing an appropriate level of oversight of the UIHC," (4) "[m]onitoring planning, opportunities, and achievements," (5) "[r]eviewing, monitoring, and recommending long-range capital plans," and (6) "[a]ssessing recommendations related to the UIHC." Iowa Bd. of Regents Policy Manual, § 1.2(C).[4]

The Board of Regents adopts bylaws for UIHC. *See, e.g.*, Meeting of Board of Regents, State of Iowa (Apr. 19–20, 2023) (approving UIHC amended and restated bylaws for 2023).[5] And those bylaws provide, in relevant part,

> The UIHC is a state institution, part of the University of Iowa, and an integral part of the health sciences complex at the University of Iowa. Chapter 262 of the Code of Iowa, which authorizes and identifies the responsibilities of the Board of Regents, State of Iowa (hereinafter referred to as the "Board of Regents"), delineates the authority given to the Board of Regents to act as the ultimate governing body of the UIHC as an organizational unit of the University of Iowa.

Amended and Restated Bylaws Rules & Regulations of the Univ. of Iowa Hospitals and Clincs and Its Clinical Staff, at 4 (2023).[6] Significant actions of UIHC require Board of Regents approval.

---

[4] https://www.iowaregents.edu/plans-and-policies/board-policy-manual/12-board-of-regents-committees.

[5] https://www.iowaregents.edu/news/board-news/april-19-20-2023-meeting-recap.

[6] https://www.iowaregents.edu/media/cms/0423_UIHC_3__UIHC_Proposed_Amended __58174B1185F46.pdf; https://www.iowaregents.edu/news/board-news/april-19-20-2023-meeting-recap.

For example, the Board of Regents recently approved the University of Iowa's acquisition of certain assets of Mercy Hospital, Iowa City—which will be incorporated into UIHC.[7]

Because UIHC is part of the University of Iowa, and thus a Regents institution, its employees are state employees. *See* Iowa Code § 8A.12(5); Iowa Admin. Code ch. 681-3; UI Policy Manual, § III.1.2. The salaries of all UIHC employees are public records.[8] Indeed, Iowa Code "chapter 22 makes the UIHC records public records because the UIHC is a state hospital." *Burton v. Univ. of Iowa Hosps. & Clinics*, 566 N.W.2d 182, 186 (Iowa 1997). UIHC employees have two retirement option plans. *See* FY 2023 UIHC Financial Report, at 31.[9] One option is to participate in the University of Iowa Retirement Plan, which is administered by the Teachers Insurance and Annuity Association. *Id.* UIHC employees who decline to participate in the University's plan are defaulted into Iowa Public Employees' Retirement System (IPERS). *Id.* UIHC contributed $11.6 million to IPERS in the fiscal year ending June 30, 2023. *Id.* at 33.

Many employees at UIHC are covered by collective bargaining agreements with two labor unions: American Federation of State, County, and Municipal Employees (AFSCME) Council 61 and Service Employees International Union (SEIU) Local 199. The Board of Regents negotiates the terms of, and binds UIHC to, collective bargaining agreements with SEIU. *See, e.g.*, Meeting of Board of Regents, State of Iowa (Apr. 19–20, 2023) (ratifying the "collective bargaining agreement with the Service Employees International Union Minnesota & Iowa (SEIU) for the tertiary health care employees at the University of Iowa Hospitals and Clinics"), *supra* note 5. And for UIHC employees covered by the Regents merit system rules—employees like clerks, cooks,

---

[7]  https://www.iowaregents.edu/media/cms/0923_ITEM_5a__August_8_Minutes_5FDEE BB6F324F.pdf;  https://www.iowaregents.edu/media/cms/0823_ITEM_2__SUI_Business_Acqui siti_5C7F44BDD1D58.pdf. Notably, this asset purchase agreement was entered into by the State of Iowa, on behalf of the State University of Iowa.

[8] https://www.legis.iowa.gov/publications/fiscal/salaryBook. Yeisley herself is a UIHC employee, and searching for her name in the database provides her salary information.

[9] https://www.legis.iowa.gov/docs/publications/DF/1366416.pdf.

and custodians—the State of Iowa negotiates the terms of, and binds UIHC to, collective bargaining agreements with AFSCME.[10]

On matters of organization and supervision, *Biden v. Nebraska* is instructive. 143 S. Ct. 2355, 2366 (2023). There, the Missouri Higher Education Loan Authority (MOHELA) was deemed an instrumentality of the State of Missouri. *Id.* MOHELA was operated by a seven-member body, five of which were appointed by the governor and confirmed by the senate. *Id.* The governor could remove any member for cause. *Id.* MOEHLA provided mandatory annual financial reports to the Missouri Department of Education. *Id.* So MOHELA was "'directly answerable' to the State." *Id.* (quoting *Cas. Reciprocal Exchange v. Missouri Employers Mut. Ins.,* 956 S.W.2d 249, 254 (Mo. 1997)). Missouri also set "the terms of its existence' and only the State 'can abolish [MOHELA] and set the terms of its dissolution.'" *Id.* (quoting *Casualty Reciprocal Exchange*, 956 S.W.2d at 254–55). Thus, "[b]y law and function, MOEHLA is an instrumentality of Missouri: It was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State." *Id.* And its status as an instrumentality was not overcome by its substantial annual revenue or its financial independence from Missouri. *See id.* at 2386–87 (Kagan, J., dissenting).

So too here. The State of Iowa established UIHC to further a public purpose. UIHC is governed by a public body, the Board of Regents, whose members are appointed and removable by the Governor and Senate. *See* Iowa Code §§ 262.2, 262.4. UIHC files mandatory annual financial statements with the Iowa Legislature. *See id.* § 263A.13. UIHC is thus directly answerable to the State and serves a vital public purpose: providing a "comprehensive health care center for the State of Iowa, thereby promoting the health of the citizens of Iowa." UI Policy Manual, § I.2.3(13)(b). By law and function, UIHC is an instrumentality of Iowa.

---

[10] https://das.iowa.gov/state-employees/collective-bargaining. *See also* Iowa Admin. Code r. 681-3; https://www.iowaregents.edu/plans-and-policies/regent-merit-system-pay-plan.

**B. The State of Iowa exerts significant control over UIHC.**

Turning to the autonomy factor, UIHC is not free to act or spend its revenue as it pleases. Rather, it is bound by Iowa laws that impose specific mandates, as well as Board of Regents directives.

As this Court previously noted, at least one entire chapter and one subchapter of the Iowa Code directly govern UIHC affairs. *See* Iowa Code ch. 263A ("Medical and Hospital Buildings at University of Iowa"); Iowa Code ch. 263, Subchapter IV ("Hospitals and Clinics—Patient Care"). This is on top of the parts of the Iowa Code governing the University of Iowa more broadly. *See generally* Iowa Code chs. 262, 262A, 262B, 263.

Those laws impose mandates that, if imposed on a private entity, would likely constitute unconstitutional takings. For example, UIHC must accept and provide "treatment and care" to any patient sent by the Director of the Department of Health and Human Services or the Director of the Department of Corrections. Iowa Code § 263.21. UIHC may not turn away prison inmates or other individuals housed in state institutions. *Id.* And all UIHC real estate "and the improvements erected thereon shall be taken and held in the name of the state of Iowa." *Id.* § 263A.2.

Significantly, the Iowa Legislature dictates how UIHC may spend its earned revenue. *See* Iowa Code § 263.18(3) ("Earnings of the university of Iowa hospitals and clinics shall be administered so as to increase, to the greatest extent possible, the services available for patients, including acquisition, construction, reconstruction, completion, equipment, improvement, repair, and remodeling of medical buildings and facilities, additions to medical buildings and facilities, and the payment of principal and interest on bonds issued to finance the cost of medical buildings and facilities as authorized by the provisions of chapter 263A."). UIHC must transmit to the general assembly its independently audited financial statements each fiscal year. *Id.* § 263A.13. UIHC is also subject to routine and ad hoc public audits by the Auditor of State. *Id.* § 11.2.[11]

---

[11] *See, e.g.*, Report on Special Investigation of the University of Iowa Hospitals and Clinics Care Coordination Division, Auditor of State (Apr. 26, 2022), https://www.auditor.iowa.gov/reports/file/69210/embed.

And those statutory directives are in addition to substantial day-to-day control by the Board of Regents. If UIHC wants to raise funds for a project or facility, the Board of Regents must issue the bonds or notes. *Id.* § 263A.3. UIHC physicians and surgeons may charge patients for care provided, but only "under such rules, regulations, and plans approved by the state board of regents." *Id.* § 263.18.[12] UIHC cannot purchase at will, but must buy its "materials, appliances, instruments, or supplies . . . pursuant to open competitive quotations, and all contracts for such purposes shall be in compliance with purchasing policies of the state board of regents." *Id.* § 263.19. And as discussed above, the Board of Regents controls the terms of UIHC bylaws and collective bargaining agreements.

In short, UIHC is subject to state control. *See Daniel v. Am. Bd. of Emergency Medicine*, 988 F. Supp. 127, 152–81 (W.D.N.Y. 1997) (extending Eleventh Amendment immunity to Ohio State University Hospital, Oregon Health Sciences University Hospital, the University of California (Los Angeles) Medical Center, the University of California (Irvine) Medical Center, the University of California (San Diego) Medical Center, University Hospital at the State University of New York at Stony Brook, the University Hospital at the University of New Mexico School of Medicine, and the University of Massachusetts Medical Center in large part due to degree of state supervision and control over each university hospital); *Pub. Sch. Retirement Sys. of Missouri*, 640 F.3d at 825–33 (finding Public School Retirement System of Missouri an arm of the State of Missouri, in part because the state exercised substantial control over its actions and leadership); *MUSC Health Cancer Care Org., LLC v. Med. Univ. Hosp. Auth.*, 2023 WL2388712 (D.S.C. Mar. 6, 2023) (finding university hospital an arm of the state despite no clear obligation for the state to pay hospital debts because, *inter alia*, state held significant "veto power" over hospital operations, including purchasing, use of earnings, issuing bonds, and regular public audits).

This is also where UIHC departs from the hospitals in *Takle* and *Hennessey*. In *Takle*, the Wisconsin Legislature "spun off" the University of Wisconsin's hospital into a separate authority,

---

[12] *See, e.g.*, https://www.iowaregents.edu/media/cms/0623_UIHC_3__Proposed_Rate_Increase_04DEA962EF01C.pdf (considering proposed 6% hospital rate increase).

distinct from the university itself. *Takle v. Univ. of Wisc. Hosp. & Clinics Author.*, 402 F.3d 768, 770 (7th Cir. 2005). The legislature believed the hospital was "hampered by restrictions imposed by state law on hiring, tenure, and compensation of state employees and on the making of state contracts relating to construction and procurement." *Id.* So it relieved the hospital from state affiliation and instead reorganized it as an "independent, nonprofit entity." *Id.* After the privatization, the hospital exercised complete autonomy in property ownership, contracts, employment, and debt obligations. *Id.*

Similarly, in *Hennessey*, the Kansas Legislature severed a university hospital from the university itself and created a separate hospital authority. *Hennessey v. Univ. of Kansas Hosp. Auth.*, 53 F.4th 516, 534 (10th Cir. 2022). After the hospital's privatization, the legislature enacted a provision stating "[f]ollowing the creation of [UKHA] and on the transfer date under th[e] act, the regents shall have no further control over, or responsibility for the operation of the university of Kansas hospital." *Id.* at 541 (quoting  Kan. Stat. Ann. § 76-3310) (alterations in original). Relinquishing state control was evident throughout the hospital authority's new statutes. For instance, the authority was empowered to "establish policies and procedures regarding any services rendered for the use, occupancy or operation of any [hospital] facility" and the policies established are "not to be subject to supervision or regulation by any commission board, bureau or agency of the state." *Id.* at 534 (quoting (Kan. Stat. Ann. § 76-3308(a)(15)). It likewise could charge any fees or rates for any services "without the affixing of said rates being subject to the supervision or regulation by the state." *Id.* The authority also had the power to "form contracts without approval or oversight from the state or any state agency." *Id.* at 540.  As for governance, the governor did not have sole discretion in appointing the board and had no removal power. *Id.* at 537. Kansas law also explicitly declared hospital employees "shall not be considered state employees" and left it to the hospital to create its own personnel structures. *Id.* (quoting Kan. Stat. Ann. § 76-3303(h)).

UIHC does not resemble the formerly public hospitals that were privatized in *Takle* and *Hennessey*. UIHC has not been severed from the University of Iowa but is expressly listed as a Regents institution. It is an integral component of the University of Iowa, organizationally akin to

research and athletics. Its employees are state employees. UIHC is subject to the Regents employment merit system. UIHC is bound by Regents- and Iowa Department of Administrative Services-negotiated collective bargaining agreements. UIHC's purchasing and contract power is subject to state laws, regulations, and Board of Regents oversight. And UIHC's policies and procedures are subject to state laws and Board of Regents approval.

Yeisley's Amended Complaint ignores this overwhelming degree of state control and instead focuses on the micro. According to her "information and belief,"[13] the specific decision to add Facebook Pixel to UIHC webpages "was in no way informed or controlled by any elected or appointed official or body of the government of the State of Iowa." Am. Compl. ¶ 150. But it is unclear why that matters. Under *Greenwood*, courts look to the broader nature of the entity and the degree to which it is subject to direct oversight and control by the State. There is no inquiry into the status of a particular actor, nor could such status be relevant—all UIHC employees are state employees. State action isn't transformed into private conduct merely because it was done by a rank-and-file state employee rather than senior state officials. If Yeisley's position were accepted, nearly every state action except for enterprise-wide or state-wide policy decisions would fall outside the Eleventh Amendment's reach. That is not the law.

### C. The State of Iowa is responsible for UIHC settlements and judgments, UIHC receives state appropriations, and UIHC's strong financial position does not overwhelm all other sovereignty factors.

Finally, UIHC's finances and the State's consistent payment of judgments and settlements against UIHC confirm it is an instrumentality of the State of Iowa.

First, Yeisley asserts—again on "information and belief"—that "any judgment against [UIHC] would be paid out of its own finances and not state coffers." Am. Compl. ¶ 151. But the State's general fund routinely pays judgments and settlements against UIHC.

---

[13] "'Upon information and belief' is a lawyerly way of saying that the [Plaintiff] does not know that something is a fact but just suspects or has heard it." *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F. App'x 377, 387 (3d Cir. 2020).

Generally, tort claims against UIHC are paid from the State general fund, subject to two exceptions that would not apply here. First, "[b]y interagency agreement, tort liability claims under $5,000 may be administered by the University subject to a maximum expenditure of $100,000 per year. All other tort claims may be paid from the State's general fund." FY 2023 UIHC Financial Report, *supra* note 9, at 43. Second, the Board of Regents, University of Iowa Health Care, and Iowa Department of Justice recently entered into a 28E Agreement, which allocated responsibility for paying medical malpractice claims. 28E Agreement M516354 (Aug. 30, 2023).[14] The Agreement provides that UI Health Care—which includes UIHC— will pay certain claims arising out of patient care up to $6 million per claim, and up to an annual limit of $15 million. *Id.* §§ III.A.1, III.A.2. The State general fund will pay the remaining balance on any claim exceeding $6 million and will pay the full sum of all claims after the $15 million annual ceiling is reached. *Id.* And because state dollars are always on the line—either because the annual limit has been reached or a covered settlement would contribute toward reaching the annual limit—all claims remain subject to review and approval by the State Appeal Board. *Id.* § IV.D.

The Agreement's existence and language is instructive. Indeed, it again confirms that suits against UIHC and its employees are considered "suit[s] against the state." *Id.* § I.B.1. If UIHC was responsible for paying judgments out of its own pockets, this Agreement would be unnecessary. As well, the parties were careful to note that "[n]othing in this Agreement shall be construed, for any reason, to waive or otherwise implicate or affect the sovereign immunity of any of the Parties." *Id.* § VII.B. If UIHC were not an arm of the State, or if judgments against UIHC did not implicate public funds, this provision would likewise be unnecessary.

Additionally, the State exercises significant control over payment of claims against UIHC or arising out of UIHC's conduct. Just considering 2023, the State Appeal Board adjudicated claims against UIHC at every meeting except September. *See* App. at 2–23. As for settlements, in February, the State approved and paid a $55,000 settlement with a former UIHC physician alleging

---

[14] https://filings.sos.iowa.gov/28E/Search/FinalPDFDocument/M516354.

breach of contract. App. at 25, 27–32. Also in February, the State approved and paid a $312,000 settlement with a former UIHC employee alleging Iowa Civil Rights Act violations. App. at 25, 33–41. In June, the State approved and paid a $5 million medical malpractice settlement. App. at 45, 48–55. Also in June, the State approved and paid a $495,000 settlement with a former UIHC physician alleging Iowa Civil Rights Act violations. App. at 45, 56–63. State coffers thus routinely pay claims arising from UIHC's (alleged) common law and statutory violations, and this suit is no different.

Second, and as discussed above, UIHC's finances are subject to state control. UIHC receives appropriations from the Iowa Legislature.[15] Moreover, how it spends its earnings, how it chooses its vendors, how it enters contracts, and who takes title to its property are all subject to state control and regulation. Iowa Code §§ 263.13, 263.19, 263A.2.

And third, that UIHC derives the majority of its revenue from patient charges rather than state appropriations cannot overwhelm every other sovereign characteristic. True, UIHC has significant revenue and its earnings are siloed from the state treasury. Iowa Code § 263.18(2). But that is neither uncommon nor dispositive. *See Pub. Sch. Retirement Sys. of Missouri*, 640 F.3d at 830 (finding retirement system to be an arm of the state even though it was not funded by state appropriations and its finances were separate from state treasury); *Kohn v. State Bar Assoc. of Calif.*, No. 20-17316, 2023 WL 8441781, at *13–14 (9th Cir. Dec. 6, 2023) (en banc) (reconsidering its "arm of the state jurisprudence to better reflect the Supreme Court's most recent guidance" and finding the State Bar Association of California is entitled to Eleventh Amendment immunity despite the state not being "liable for a judgment against the State Bar"). Indeed, MOHELA raked in $88.9 million last year in student loan fees, which were not comingled with state funds. *Biden*, 143 S. Ct. at 2366 (majority op.), 2387 (Kagan, J., dissenting). And the United States Postal Service's third-quarter operating revenue was roughly $18.6 billion.[16] *U.S. Postal*

---

[15]   https://fmb.fo.uiowa.edu/university-iowa-hospitals-and-clinics   (UIHC   received $634,502 in state appropriations in FY 2023 and FY 2024).

[16]   *See*  https://about.usps.com/newsroom/national-releases/2023/0808-usps-reports-third-quarter-fiscal-year-2023-results.pdf.

*Service v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744 (2004) (recognizing immunity for USPS); *see also* 39 U.S.C. §§ 409 (explicitly waiving sovereign immunity for suits against the USPS), 2003 (establishing the Postal Service Fund available to the USPS "to carry out the purposes, functions, and powers authorized by this title" and funded in part by "revenues from postal and nonpostal services rendered by" the USPS). And elsewhere in Iowa, the Iowa Legislature has created other self-funded entities which are still state instrumentalities, such as the Iowa Alcoholic Beverages Division. *See* Iowa Code ch. 123.

### D.  UIHC is sovereignly immune from Yeisley's claims.

Applying *Greenwood*, this suit must end. UIHC's powers and characteristics show that it is a Board of Regents institution that provides vital health services to the citizens of Iowa. UIHC is subject to substantial state control, with its earnings, contracts, purchasing, employment, labor, and property interests all subject to state laws, regulations, policies, and oversight. And the State regularly pays claims against UIHC arising out of common law or statutory violations, just like this suit. So UIHC is an instrumentality of the State of Iowa entitled to Eleventh Amendment immunity. Because this Court has already held that each of Yeisley's claims cannot proceed against an arm of the State, dismissal is required.

### II.    Yeisley's Amended Complaint fails to state a claim.

The Court can stop here and dismiss this suit outright, as UIHC is immune from all claims. But in the interest of completeness, UIHC will briefly address the merits of each claim. As with her original Complaint, the problems with Yeisley's Amended Complaint are not just jurisdictional, but also substantive. Yeisley's suit must therefore also be dismissed because she has failed to state a claim under Rule 12(b)(6).

### A.  Count I fails because UIHC was not unjustly enriched.

Count I alleges UIHC was unjustly enriched in violation of the "principles in Iowa . . . ." Am. Compl., ¶ 174. Iowa courts follow the restatement for unjust enrichment claims. *Rilea v. State*, 959 N.W.2d 392, 394 (Iowa 2021). An unjust enrichment claim has three basic elements: "(1) enrichment of the defendant, (2) at the expense of the plaintiff, (3) under circumstances that make

it unjust for the defendant to retain the benefit." *Endress v. Iowa Dep't of Hum. Servs.*, 944 N.W.2d 71, 80 (Iowa 2020).

Here, as with the original Complaint, the Amended Complaint contains no allegations establishing that it would be unjust for UIHC to retain any benefit here. As an initial matter, the only benefit Yeisley identifies UIHC as having received from its use of the pixel was an ability to advertise more effectively. *See* Am. Compl., at ¶ 148. But it is unclear how such an intangible benefit could be disgorged to her through "restitution"—the remedy available for an unjust enrichment claim, *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154, n.1 (Iowa 2001)— and Yeisley herself offers no theory. What is more, an unjust enrichment claim lies only if Yeisley has alleged that UIHC committed an "interference with [Yeisley's] legally protected interests" through "conduct that is tortious, or that violates another legal duty or prohibition…*if the conduct constitutes an actionable wrong* to" Yeisley. Restatement (Third) of Restitution & Unjust Enrichment § 44 (emphasis added). That is because unjust enrichment "does not create a cause of action where the claimant would otherwise have none." *Id.* § 44, cmt. a. Instead, it only gives rise to a remedy when a plaintiff has a cause of action but "could not [otherwise] prove damages." *Id.* Here, however, as explained throughout the rest of this Motion, Yeisley has not shown that UIHC committed any such tortious conduct. Indeed, far from giving rise to "an actionable wrong," Yeisley's claims are non-actionable as a matter of law. Accordingly, for all of the same reasons, Yeisley's unjust enrichment claim fails.

**B.  Count II fails because UIHC was a party to the communication.**

Next considering Count II, Yeisley brings a claim under the Electronic Communications Privacy Act ("ECPA") specifically alleging violations of the Federal Wiretap Act ("FWA"), 18 U.S.C. §§ 2511(1)(a), (c), and (d)). But this claim immediately fails because the FWA is a one-party consent statute and UIHC was a consenting party to the communication.

It does not violate the FWA for a person "to intercept a wire, oral, or electronic communication where such person is a party to the communication." 18 U.S.C. § 2511(2)(d). Courts have repeatedly enforced this limitation, explaining the FWA "contain[s] an exemption

from liability for a person who is a 'party' to the communication." *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020). Indeed, "it is not unlawful to intercept" a communication under the FWA, "if a party to the communication has given prior consent to the interception." *United States v. Corona-Chavez*, 328 F.3d 974, 978 (8th Cir. 2003). And if it is a party itself doing the intercepting, it has, by definition, consented to its own actions.

There is no dispute that all "communications" were exchanged "between Plaintiff . . . and Defendant via its Website," Am. Compl. at ¶¶ 179–80, meaning UIHC was a party to the communications. Accordingly, under the Amended Complaint's own allegations, UIHC cannot be held liable under the FWA. *See, e.g.*, *Jurgens v. Build.com, Inc.*, No. 4:17-cv-00786-AGF, 2017 WL 5277679, at *5 (E.D. Mo. Nov. 13, 2017) (dismissing FWA claim where defendant was a party to the communications at issue); *Capitol Recs. Inc. v. Thomas-Rasset*, No. 06-1497 (MJD/RLE), 2009 WL 1664468, at *4 (D. Minn. Jun. 11, 2009) (same); *Kurowski v. Rush Sys. For Health*, No. 22 C 5380, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023) (same).

Nor can Yeisley avail herself of the "crime-tort exception" to the FWA's one-party rule. "[T]he crime-tort exception . . . is inapplicable where the defendant's primary motivation was to make money, not to injure plaintiffs tortiously." *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 WL 17869218, at *12 (N.D. Cal. Dec. 22, 2022). Here, Yeisley alleges "[t]he *sole purpose* of the use of the Facebook Pixel on Defendant's Website was marking and profits." Am. Compl. ¶¶ 145, 190 (emphasis added). This is exactly the kind of conduct for which courts have held the crime-fraud exception not to apply. *See Google Inc. Gmail Litig.*, No. 13-MD-02430, 2014 WL 1102660, at *18 n. 13 (N.D. Cal. Mar. 18, 2014).

"There is a temporal thread that runs through the fabric of the statute and the case law. At the time of the recording the offender must intend to use the recording to commit a criminal or tortious act." *Caro v. Weintraub*, 618 F.3d 94, 99 (6th Cir. 2010). Unless the offender intends to commit a tort or crime "at the moment he hits 'record,'" there is no FWA violation. *Id.* at 100. Indeed, it matters that Congress chose the word "purpose"—"the offender must have as her objective a tortious or criminal result." *Id.* at 100. If Congress wanted to sweep as broadly as

Yeisley tries to here, it could have "chosen to define the exception in terms of interception of oral communications *resulting in* a tortious or criminal act. But Congress limited the cause of action to instances where one party to the conversation deliberately seeks to harm the other participant through the information intercepted." *Id. See also Meredith v. Gavin*, 446 F.2d 794, 799 (8th Cir. 1971) (discussing purpose of crime-tort exception). And because UIHC at the moment it functionally hit "record" did not act with a tortious motive, Count II fails as a matter of law and should be dismissed.

### C. Count III fails because UIHC accessed only information that Yeisley willingly provided to it.

As for Count III, Yeisley fails to allege a cognizable claim under the CFAA. To state a claim, a plaintiff must plead facts showing that the defendant "exceed[ed] authorized access" to a protected computer. 18 U.S.C. § 1030(a)(1). Yeisley contends that UIHC "exceeded its unauthorized [*sic*] access because Defendant access Plaintiff's . . . Information under false pretenses." Am. Compl. ¶ 198. But her claim fails as a matter of law for at least three reasons.

First, the CFAA prohibits unauthorized access only of "protected computers," 18 U.S.C. § 1030(e)(2)(B), which the Amended Complaint identifies as "Plaintiff's . . . computers and/or mobile devices," Am. Compl. ¶ 196. So to succeed under the CFAA, the Amended Complaint must allege facts showing that UIHC "obtain[ed] information from particular areas in the computer—such as files, folders, or databases—to which [its] computer access does not extend." *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1198 (9th Cir. 2022); *see also SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1227 (11th Cir. 2023) (explaining that a "protected computer" is limited to "an electronic . . . or other high speed data processing device" that is "used in or affecting interstate commerce"). Here, however, there are no allegations that UIHC accessed Yeisley's computers or mobile devices at all—instead, the Amended Complaint alleges that it accessed the

"Information" that Yeisley *provided to* UIHC.[17] *See* Am. Compl. at ¶¶ 100–01. Indeed, the Amended Complaint alleges that UIHC "installed and implemented the Facebook Tracking Pixel [not on Yeisley's computer or devices, but] on its [own] Website." *Id.* at ¶ 3; *see also id.* at ¶¶ 6, 49, 57, 81.

Second, UIHC's purported access to Yeisley's information was not "unauthorized." Rather, as the Amended Complaint admits, *Yeisley* "provided" that information to UIHC willingly. *See, e.g.*, *id.* at ¶¶ 25–27. Yeisley tries to skirt this authorization by alleging UIHC induced such provision "under false pretenses," Am. Compl. ¶ 198. But that argument fails. As an initial matter, the Amended Complaint does not identify any representation that UIHC made to Yeisely—*i.e.*, any pretense that UIHC advanced—that was false. And in any event, the CFAA "does not cover those who . . . have improper motives for obtaining information that is otherwise available to them." *HiQ*, 31 F.4th at 1198; *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (explaining CFAA "covers those who obtain information from particular areas in the computer— such as files, folders, or databases—to which their computer access does not extend. It does not cover those who, like [the plaintiff], have improper motives for obtaining information that is otherwise available to them"). Accordingly, while acting "under false pretenses" to obtain access to a protected computer "may violate the license of use, it does not violate the CFAA, because the user was [still] authorized" (even if under false pretenses) to have that access.[18] *Perfect Enters. v.*

---

[17] The Amended Complaint also alleges that UIHC "exceeds its unauthorized [*sic*] access because Defendant violated its own Privacy Policies in disclosing Plaintiff's and Class Members' Private Information to Facebook." Am. Compl. ¶ 199. But even taking this allegation as true, courts have made clear that "'misuse or misappropriation' of information is not actionable under the CFAA." *Delacruz v. State Bar. of Cal.*, No. 16-cv-06858-BLF, 2018 WL 3077750, at *7 (N.D. Cal. Mar. 12, 2018) (quoting *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012)). Stated otherwise, "CFAA target[s] the unauthorized procurement or alteration of information, not its misuse or misappropriation." *Nosal*, 676 F.3d at 863. Accordingly, this theory, too, fails as a matter of law.

[18] To the extent Yeisley may argue that the Pixel accessed her information without her knowledge or authorization, this argument ignores that she authorized exactly that when she agreed to Facebook's Terms of Service. *See Lloyd v. Facebook, Inc.*, No. 21-cv-10075, 2022 WL 4913347, at *10 (N.D. Cal. 2022) (holding that a plaintiff's assent to the Facebook Terms means "there [is] no reasonable expectation of privacy" against data being shared with Facebook).

*Olmedo*, No. ED CV19-00690 JAK (KKx), 2019 WL 13081557, at *6 (C.D. Cal. May 2, 2019); *Matot v. CH*, 975 F. Supp. 2d 1191, 1195 (D. Or. 2013) (explaining that courts have been "unwilling to recognize [a] claim under the CFAA" based on a "'trespass under false pretenses' scenario").

Third, the Amended Complaint pleads no facts showing that UIHC's use of the Pixel caused a "loss . . . aggregating at least $5,000 in value," as required to bring a private CFAA action. 18 U.S.C. §§ 1030(a)(2)(C), 1030(c)(4)(A)(i)(I); *id.* § 1030(g). Yeisley's only theory as to how she suffered a $5,000 loss is that the information captured by the pixel was "never intended for public consumption." Am. Compl., at ¶ 200. But the Supreme Court has recently made clear that a "loss" in the context of the CFAA includes only those "costs caused by harm to computer data, programs, systems, or information services." *Van Buren*, 141 S. Ct. at 1659–60. That is, it requires "technological harms—such as the corruption of files"—because those are "the typical consequences of hacking," and thus excludes intangible or other privacy harms like Yeisley alleges here. *Id.* Thus, the Amended Complaint fails to allege a viable CFAA violation and Count III must be dismissed.

## CONCLUSION

Yeisley's Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

*/s/ Stan Thompson*
STAN THOMPSON
Deputy Attorney General

*/s/ Tessa Register*
TESSA REGISTER
Assistant Solicitor General

*/s/ Christopher J. Deist*
CHRISTOPHER J. DEIST
Assistant Attorney General
Iowa Department of Justice
1305 East Walnut Street, 2nd Fl.

21

Des Moines, Iowa 50319
Ph: 515-281-4951
Em: Stan.Thompson@ag.iowa.gov
Em: Tessa.Register@ag.iowa.gov
Em: Christopher.Deist@ag.iowa.gov

ATTORNEYS FOR DEFENDANT

All parties served via CM/ECF on December 13, 2023.