IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| EILEEN YEISLEY, on Behalf of Herself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF IOWA HOSPITALS & CLINICS,<br><br>    Defendant. | No. 3:23-cv-00025-SHL-HCA<br><br><br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |

  Plaintiff Eileen Yeisley brings statutory and common law claims against Defendant University of Iowa Hospitals & Clinics ("UIHC") for allegedly sharing her personally identifiable information with third parties through pixel tracking technology on UIHC websites. The Court previously concluded, on a limited record, that UIHC was protected from such claims by sovereign immunity, although the Court also granted Yeisley leave to amend to try to address sovereign immunity in a more fulsome way. Based on the now-expanded record, the Court again concludes that UIHC is entitled to sovereign immunity. The Court therefore GRANTS UIHC's Motion to Dismiss for Lack of Jurisdiction WITH PREJUDICE.

**I. FACTUAL BACKGROUND.[1]**

  UIHC is a health care provider with headquarters in Iowa City, Iowa. (ECF 34, ¶ 43.) UIHC is part of the state-owned University of Iowa and under the control of the Iowa Board of Regents. *See* Iowa Code § 262.7(1). The members of the Iowa Board of Regents are appointed by Iowa's Governor with approval of the Iowa Senate. *See* Iowa Code § 262.2.

  UIHC is a "covered entity" under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). (ECF 34, ¶ 44.) UIHC manages or controls two websites that it encourages people to use to book medical appointments, locate physicians and treatment facilities, communicate medical symptoms, search for medical conditions and treatment options, and sign

---

[1] On a motion to dismiss, the Court accepts as true all well-pled facts and draws all reasonable inferences in the light most favorable to the plaintiff. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). The recitation of facts in the Background section is designed to be consistent with this standard and should not be construed as findings of fact for any other purpose.

up for events and classes. (Id., ¶ 2.) UIHC installed and implemented the Facebook Tracking Pixel on its websites, thus allowing the websites to track information such as how long a user spends on a web page, which buttons the person clicks, which pages the person views, and the text or phrases the person types. (Id., ¶¶ 3, 9.) The Pixel can then share this information with Facebook. (Id., ¶ 10.) UIHC uses Pixel data for marketing purposes to create targeted advertisements to individual users. (Id., ¶ 13.)

Plaintiff Eileen Yeisley ("Yeisley") is an Iowa resident who has received health care services at UIHC since the early 1980s. (Id., ¶¶ 35–36.) She has used the UIHC websites to search for physicians, schedule appointments and procedures, receive and discuss medical diagnoses from her health care providers, receive lab results, and review medical records. (Id., ¶ 37.) She also has been a Facebook user since 2009. (Id., ¶ 38.) She accesses UIHC's websites at the direction and encouragement of UIHC. (Id., ¶ 39.) Yeisley has never consented to UIHC sharing her online communications with third parties and instead believed those communications would be kept private. (Id., ¶¶ 40–41.) However, UIHC has shared her private information with third parties like Facebook and Google. (Id., ¶ 42.)

UIHC has privacy policies that inform Yeisley, other patients, and website users that UIHC will keep their information private and confidential and disclose it only under certain circumstances, none of which apply to the sharing of information with third parties like Facebook or Google. (Id., ¶¶ 110–13.) Yeisley alleges that UIHC violated its privacy policies by "unlawfully intercepting" her private information and disclosing it to third parties for marketing purposes without valid consent or authorization. (Id., ¶ 114.) She further alleges that UIHC violated HIPAA standards as set forth in guidance from the United States Department of Health and Human Services. (Id., ¶ 116, 125.)

On October 18, 2023, the Court dismissed Yeisley's original Class Action Complaint, concluding on a limited record that UIHC satisfied its burden of proving that it was entitled to sovereign immunity. (ECF 31.) Given the idiosyncratic way the issue of sovereign immunity had been raised, however, the Court *sua sponte* granted Yeisley leave to file an amended complaint to address sovereign immunity in a more fulsome way. (Id., p. 8.) Yeisley filed her First Amended Class Action Complaint a few weeks later, asserting causes of action for Unjust Enrichment (Count I) and violations of the Electronic Communications Privacy Act (Count II) and Computer Fraud and Abuse Act (Count III). As it relates to sovereign immunity, Yeisley alleges: (i) UIHC is funded

2

in substantial part by the revenue it receives from services, including any revenue and/or saved costs stemming from the use of the Facebook Pixel; (ii) the decision to use the Facebook Pixel was made exclusively by UIHC's staff for budget reasons and not related to any directive from the State of Iowa or any of its officials; and (iii) any judgment against UIHC would be paid out of its own finances and not the state treasury. (ECF 34, ¶¶ 149–151.) UIHC moves to dismiss for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) based on sovereign immunity, as well as for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (ECF 37.)

## II.     LEGAL BACKGROUND AND STANDARDS.

### A.  Motion to Dismiss Standard.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court is not obligated to accept legal conclusions, however, "and [a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

### B.  Sovereign Immunity.

Under principles of sovereign immunity, "a State may be subject to suit only in limited circumstances." *PennEast Pipeline Co., LLC v. New Jersey*, 141 S.Ct. 2244, 2258 (2021). First, "[a] State may of course consent to suit, although such consent must be 'unequivocally expressed.'" *Id.* (quoting *Sossamon v. Texas*, 563 U.S. 277, 284 (2011)). Second, "Congress may also abrogate state sovereign immunity under the Fourteenth Amendment, again assuming it does so with the requisite clarity." *Id.* (internal citations omitted). Sovereign immunity "extends to states and 'arms' of the state," although it does not extend to county or municipal governments. *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (quoting *Gorman v. Easley*, 257 F.3d 738, 743 (8th Cir. 2001), *rev'd on other grounds sub nom. Barnes v. Gorman*,

536 U.S. 181 (2002)). Whether an agency is an "arm of the State" is a question of federal law but must be considered in light of "the provisions of state law that define the agency's character." *Id.* (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997)). "Specifically, courts assess the agency's degree of autonomy and control over its own affairs and, more importantly, whether a money judgment against the agency will be paid with state funds." *Id.*

"Sovereign immunity is a jurisdictional doctrine," and thus motions to dismiss based on sovereign immunity are governed by Fed. R. Civ. P. 12(b)(1). *Brown v. United States*, 151 F.3d 800, 803 (8th Cir. 1998). When, as here, the moving party treats the motion as a "factual attack" on jurisdiction, courts "may look outside the pleadings to affidavits or other documents." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). "This does not . . . convert the 12(b)(1) motion to one for summary judgment." *Harris v. PA.M. Transp., Inc.*, 339 F.3d 635, 638 n.4 (8th Cir. 2003). The burden of proof is somewhat unclear. The Eighth Circuit has recognized, in dicta, that "all of our sister circuits to address the issue have recognized that an entity asserting Eleventh Amendment immunity bears the burden of showing its entitlement to such immunity." *United States ex rel. Fields v. Bi-State Dev. Agency of the Mo.-Ill. Metro. Dist.*, 829 F.3d 598, 600 (8th Cir. 2016). The Eighth Circuit has also held, however, that "the party invoking federal jurisdiction [in a case involving sovereign immunity] must prove jurisdictional facts by a preponderance of the evidence." *Moss*, 895 F.3d at 1097. The Court will harmonize this precedent by imposing the overall burden on UIHC to establish its entitlement to sovereign immunity but imposing the burden on Yeisley to prove individual disputed facts by a preponderance of the evidence.

### III. LEGAL ANALYSIS.

#### A. UIHC Is an Arm of the State for Purposes of Sovereign Immunity.

There are several layers to the question of the Court's jurisdiction, starting with whether UIHC is an "arm of the State." The "overwhelming majority" of courts have held that state universities are entitled to sovereign immunity. *Sherman v. Curators of the Univ. of Mo.*, 16 F.3d 860, 863 (8th Cir. 1994); *see also Hadley v. N. Ark. Cmty. Tech. Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996) ("State universities and colleges almost always enjoy Eleventh Amendment immunity.") However, sovereign immunity is an affirmative defense for which UIHC bears the burden of proof. *See United States ex rel. Fields*, 829 F.3d at 600. "Each state university claiming eleventh amendment immunity 'must be considered on the basis of its own particular

4

circumstances.'" *Sherman*, 16 F.3d at 863 (quoting *Greenwood v. Ross*, 778 F.2d 448, 453 (8th Cir. 1985)).

Most appellate courts to have considered the issue have concluded that hospitals affiliated with state-owned universities are protected by sovereign or eleventh amendment immunity. *See, e.g.*, *Isaacs v. Ariz. Bd. of Regents*, 608 F. App'x 70, 76 (3d Cir. 2015) (per curiam); *United States ex rel. King v. Univ. of Tex. Health Sci. Ctr.-Hous.*, 544 F. App'x 490, 498 (5th Cir. 2013) (per curiam); *Sykes v. United States*, 507 F. App'x 455, 462 (6th Cir. 2012); *Kirkendall v. Univ. of Conn. Health Ctr.*, No. 99-7811, 2000 WL 232071, at *1 (2d Cir. Jan. 31, 2000). However, some appellate courts disagree. In *Takle v. University of Wisconsin Hospital & Clinics Authority*, the Seventh Circuit held that a hospital affiliated with the University of Wisconsin was not entitled to sovereign immunity because "it has characteristics of both a state agency and a private foundation," particularly as to financial affairs. 402 F.3d 768, 769 (7th Cir. 2005). In *Hennessey v. University of Kansas Hospital Authority*, the Tenth Circuit remanded to the district court for further factual development on whether the hospital affiliated with a state-owned university was an arm of the State. 53 F.4th 516, 532–33 (10th Cir. 2022). Like the Seventh Circuit in *Takle*, the Tenth Circuit was especially interested in understanding the hospital's finances. *Id.* at 533–36.

Eighth Circuit precedent is in accord with *Hennessey* and *Takle* in the sense that it requires lower courts to analyze the "particular circumstances" of each state university (or, in this instance, university hospital) when deciding sovereign immunity. *Sherman*, 16 F.3d at 863 (quoting *Greenwood*, 778 F.2d at 453). Specifically, and like *Hennessey* and *Takle*, courts in the Eighth Circuit must consider how the hospital is financed and "whether the funds to pay any award will be derived from the state treasury." *Greenwood*, 778 F.2d at 453. Courts also must consider "whether the action is in reality an action against the state as a result of the entity's 'powers and characteristics' under state law" and "whether the entity is autonomous and exercises a significant degree of control over its own affairs." *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996). In the Eighth Circuit, these factors are sometimes referred to as the "*Greenwood* factors," so named after *Greenwood v. Ross*. *See* 778 F.2d at 453.

Two of the *Greenwood* factors—UIHC's powers and characteristics under state law and degree of autonomy—point squarely in favor of UIHC being an arm of the state. The Iowa Constitution establishes a state university (Iowa Const. art. IX, § 11) and places it in Iowa City (Iowa Const. art. XI, § 8), where the University of Iowa has been located at all relevant times.

Iowa Code § 262.7(1) gives the Iowa Board of Regents control over "[t]he state university of Iowa, including the university of Iowa hospitals and clinics." In turn, the members of the Board of Regents are "appointed by the governor subject to confirmation by the senate." Iowa Code § 262.2. At least five different chapters of the Iowa Code govern, in whole or part, the affairs of the University of Iowa. *See* Iowa Code Chapters 262, 262A, 262B, 263, 263A. This includes one entire chapter and another entire subchapter relating specifically to UIHC. *See* Iowa Code Chapter 263A ("Medical and Hospital Buildings at University of Iowa"); Iowa Code Chapter 263, Subchapter IV ("Hospitals and Clinics—Patient Care"). Against this constitutional and legislative backdrop, the Iowa Supreme Court has unsurprisingly characterized the Iowa Board of Regents and institutions under its control as "government bod[ies]," *Gannon v. Bd. of Regents*, 692 N.W.2d 31, 42 (Iowa 2005), and "State agencies," *Papadakis v. Iowa State Univ. of Sci. & Tech.*, 574 N.W.2d 258, 260 (Iowa 1997). In other words, "[state] law characterizes the [entity] the way we would expect it to characterize an arm of the State." *Pub. Sch. Ret. Sys. of Mo. v. State St. Bank & Tr. Co.*, 640 F.3d 821, 829 (8th Cir. 2011) (treating state-affiliated entity as arm of the State).

   The remaining arm-of-the-state factors revolve around UIHC's financial affairs, including how the entity is financed and whether a money judgment would be paid with state funds. On these issues, the language of the Iowa Code points in competing directions. On one hand, the Iowa Code recognizes that UIHC will make money from providing services to patients and allows UIHC to keep those funds in its own account rather than depositing the money with the state treasury. *See* Iowa Code § 263.18(2) ("[UIHC] shall collect . . . reasonable charges for hospital care and service and deposit payment of the charges with the treasurer of the university for the use and benefit of the university of Iowa hospitals and clinics.") This lends support to Yeisley's position that UIHC is not an arm of the state. *See United States ex rel. Fields*, 872 F.3d at 881 (holding that funding factor weighs against immunity when most of an entity's funds come from sources other than the state).

   On the other hand, however, the Iowa Code shows that the Legislature retains significant control over UIHC's financial affairs despite the entity's funds not being deposited into the state treasury. Iowa Code § 263.18(3) states, for example, that UIHC must use its earnings "so as to increase, to the greatest extent possible, the services available for patients," including through investments in infrastructure and property that will be held in the name of the State of Iowa, *see* Iowa Code § 263A.2. Iowa Code § 263.18(4) establishes that charges for medical services are

subject to approval of the Board of Regents, while Iowa Code § 263.19 states that Board of Regents policies on matters such as competitive bidding govern UIHC's purchases. Iowa Code § 262.9(4) requires the Board of Regents to "[m]anage and control the property, both real and personal, belonging to the institutions" under its control, including the University of Iowa and UIHC. Iowa Code §§ 263.21–.23 require UIHC to provide care for indigent patients and "any inmate, student, patient, or former inmate of a state institution" at state expense. Finally, Iowa Code § 263A.13 requires UIHC to "transmit to the general assembly its independently audited financial statement by January 15 of each fiscal year."

Moving beyond the Iowa Code, the record as it relates to UIHC's financial affairs tips further in favor of concluding that UIHC is an arm of the state. The Board of Regents has direct control over significant UIHC financial decisions like whether to make major capital acquisitions, approve collective bargaining agreements, and enter into settlement agreements in statutory and common law claims. (ECF 37-2, pp. 7, 11, 24–63.)[2] Moreover, public records show that UIHC employees are considered state employees and thus entitled to participate in the Iowa Public Employees' Retirement System (IPERS), which is not available to workers in the private sector. *See* https://www.legis.iowa.gov/docs/publications/DF/1366416.pdf. With this public information in mind, the source of funding factor weighs in favor of concluding that UIHC is an arm of the state because even though the entity is self-sustaining in many ways, it nonetheless must spend its money consistent with the directives of the Iowa Legislature, as implemented and controlled by state-appointed members of the Board of Regents.

The final arm-of-the-state factor is whether the funds to pay any money judgment against UIHC "will be derived from the state treasury." *Greenwood*, 778 F.2d at 453. This factor, too, weighs in favor treating UIHC as an arm of the state. There are some claims that UIHC pays out of its own funds, including small-dollar tort claims up to $100,000 per year and a substantial portion of medical malpractice claims. (ECF 37-1, p. 14.) Public records reflect, however, that "[a]ll other tort claims may be paid from the State's general fund." *See* https://www.legis.iowa.gov/docs/publications/DF/1366416.pdf (last accessed February 14, 2024). The same is true for statutory employment and breach of contract claims. (ECF 37-2, pp. 7, 11,

---

[2] The Court is allowed to "look outside the pleadings to affidavits or other documents" to decide factual issues pertaining to sovereign immunity without converting the motion to dismiss into a motion for summary judgment. *Moss*, 895 F.3d at 1097.

24–63.) It therefore appears that the State general fund would be the source of funds for any judgment or settlement Yeisley might achieve here. Thus, all four *Greenwood* factors weigh to some degree or another in favor of concluding that UIHC is an arm of the state and entitled to sovereign immunity.

In arguing otherwise, Yeisley starts from the premise that sovereign immunity is an affirmative defense for which UIHC bears the burden of proof. This is correct as a principle of law, but the Eighth Circuit has shown a strong preference for having sovereign immunity decided at the earliest possible stage of the case. *See, e.g.*, *Monroe v. Ark. State Univ.*, 495 F.3d 591, 593 (8th Cir. 2007). This is because "[i]mmunity from suit is effectively lost if the party claiming it is erroneously forced to stand trial." *Id.* (alteration in original) (quoting *Williams v. Missouri.*, 973 F.2d 599, 599 (8th Cir. 1992) (per curiam)); *see also Texas v. Caremark, Inc.*, 584 F.3d 655, 658 (5th Cir. 2009) ("[T]he sovereign immunity question must be decided before further litigation proceeds; otherwise, the object and purpose of sovereign immunity—to shield the states from the burden of suits to which they have not consented—is violated.") To that end, and as noted above, the Court may consider materials outside the pleadings on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). *See Moss*, 895 F.3d at 1097. Moreover, when individual facts are in dispute, Yeisley bears the burden of proving them by a preponderance of the evidence. *See id.*

Yeisley has not identified—must less established—sufficient facts to overcome UIHC's evidence on sovereign immunity. At most, her Amended Complaint simply alleges: (i) UIHC's staff decided to use the Facebook Pixel to increase revenue and/or cut costs; (ii) UIHC's financial affairs "are at least in part independent from those of the State of Iowa because [UIHC] is funded, in substantial part, by the revenue it receives for its services—including any revenue and/or saved costs from the use of the Facebook Pixel;" and (iii) "on information and belief, any judgment against [UIHC] would be paid out of its own finances and not state coffers." (ECF 34, ¶¶ 149–151.) The first fact is unhelpful to Yeisley's position on sovereign immunity because UIHC employees are state employees. The second fact, although true, is already captured in the Court's analysis above but is not enough to tip the *Greenwood* factors in Yeisley's favor. The third fact has not been proven by a preponderance of the evidence; to the contrary, although it is not UIHC's burden, UIHC has nonetheless proven by a preponderance of the evidence that the source of funds for any judgment will be the state treasury.

Lest any doubt remain, it is put to rest by Eighth Circuit precedent strongly implying that UIHC is entitled to sovereign immunity. In a recent decision, *Myers v. Iowa Board of Regents*, the Eighth Circuit either presumed or treated as self-evident that UIHC was an arm of the state in the context of employment claims under the Fair Labor Standards Act ("FLSA"). 30 F.4th 705, 708–10 (8th Cir. 2022). An earlier case, *Brine v. University of Iowa*, similarly recognizes that the University of Iowa is entitled to sovereign immunity. 90 F.3d 271, 275 (8th Cir. 1996). This precedent is in accord with the weight of authority from other jurisdictions holding that hospitals affiliated with state universities are arms of the state. *See, e.g.*, *Isaacs*, 608 F. App'x at 76. It leaves the Court confident in its conclusion that UIHC is an arm of the state for purposes of sovereign immunity.

### B. UIHC Has Not Waived Sovereign Immunity as to the Electronic Communications Privacy Act and Computer Fraud and Abuse Act.

The Court's conclusion that UIHC is an arm of the State does not per se mean it lacks jurisdiction, as sovereign immunity can, in some circumstances, be waived or abrogated. In earlier briefing—which Yeisley incorporated by reference here—she argued that UIHC constructively waived sovereign immunity here when it adopted privacy policies stating that information gathered from website visitors "will not be sold, traded, or otherwise made public" and that UIHC will "never associate any such information with specific identities." (ECF 1, ¶¶ 112–14; id. ¶ 110 n.26.).

Yeisley supports her argument by relying on *Myers* and *Lee v. State*, 815 N.W.2d 731, 743 (Iowa 2012), which recognize that state agencies in Iowa can, in some circumstances, voluntarily assume legal consequences in a way that the Iowa Supreme Court would interpret as constructive waiver of sovereign immunity. *Lee*'s actual holding, however, is far better for UIHC than Yeisley. The Iowa Supreme Court concluded that the Iowa judicial branch did <u>not</u> waive sovereign immunity for claims under the Family and Medical Leave Act ("FMLA") despite, *inter alia*, adopting employee handbooks that informed employees of their right to take self-care leave under the FMLA. *Id.* at 742–43. *Lee* explained that the relevant language of the handbooks simply might have been designed to comply with federal law, not to waive sovereign immunity as to retrospective claims for damages. *Id.* at 743.

UIHC has an even stronger version of the same argument here. Its privacy policy tells website visitors that their "information will not be sold, traded, or otherwise made public" and that UIHC "never associate[s] [visitor] information with specific identities." This language, on its face,

9

does not expressly or implicitly refer to the two federal laws under which Yeisley raises claims (the Electronic Communications Privacy Act ("ECPA")[3] and Computer Fraud and Abuse Act ("CFAA")), much less suggest an intention to waive sovereign immunity as to those laws. This situation therefore stands in stark contrast to *Lee*, where the employee handbook devoted an entire section to the very federal law under which the plaintiff later brought her claims. *Id.* And yet the Iowa judicial branch still had sovereign immunity. *Id.*

*Myers* similarly does more to support UIHC's position than Yeisley's. Although the Eighth Circuit appears to have agreed with the district court that UIHC constructively waived sovereign immunity as to claims under the Fair Labor Standards Act ("FLSA"), the district court reached this conclusion only because UIHC employment materials specifically referenced or incorporated FLSA standards. 30 F.4th at 709. Thus, there was a direct and unmistakable link between the plaintiff's federal cause of action and the defendant's policies. The same was true in *Anthony v. State*, 632 N.W.2d 897 (Iowa 2001), which *Myers* discussed at length. In *Anthony*, the Iowa Supreme Court concluded the State waived sovereign immunity for FLSA claims when it enacted laws and regulations expressly adopting FLSA wage and overtime pay standards. *Id.* at 901–02.

The link between Yeisley's federal causes of action under the ECPA and CFAA and UIHC's privacy policy is far more attenuated than the links in *Lee*, *Myers*, and *Anthony*. As alleged in the Amended Complaint, the ECPA prohibits the interception of electronic communications, while the CFAA deals with unauthorized access to "protected computers." (E.g., ECF 34, ¶¶ 188–203, 241–46.) The privacy policy, by contrast, addresses how UIHC will use information provided by website visitors. There is overlap between the UIHC policy and the federal laws in the sense that they all deal with privacy in some way or another, but the policy is not otherwise the type of "clear declaration" the Supreme Court requires before a state agency can be deemed to have waived sovereign immunity. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76 (1999) (quoting *Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 54 (1944)); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) ("We have insisted, however, that the State's consent be unequivocally expressed."). Or, to borrow from *Lee*, Yeisley has not plausibly alleged facts that, if proven, would show that UIHC intended to subject itself to

---

[3] UIHC refers to Yeisley's ECPA claim as involving the "Federal Wiretap Act," which was originally enacted in 1968. In 1986, Congress enacted the ECPA to amend and update the Federal Wiretap Act. For simplicity, and because the ECPA was the later-enacted law, this Order will adopt Yeisley's terminology and refer to the claim as arising under the ECPA.

claims for damages under the ECPA and CFAA when it enacted a privacy policy describing how it would use information from website visitors. *See* 815 N.W.2d at 743 (placing the burden on plaintiff to show the state's intent to waive sovereign immunity).

Yeisley has not cited—and the Court is not independently able to locate—an Iowa or federal case holding that a state agency waives sovereign immunity simply by enacting policies that implicate similar interests as a federal statute, but without mentioning that statute or otherwise purporting to adopt its terms. *Cf. Lee*, 815 N.W.2d at 743 (rejecting plaintiff's attempt to use employment policies as a basis for finding waiver because the facts were "vastly different" those in prior cases where the Iowa Supreme Court found waiver). The absence of such authority is not surprising, as it would undermine well-established precedent in the United States and Iowa Supreme Courts alike that waiver of sovereign immunity is the exception, not the rule. *See id.*; *Coll. Sav. Bank*, 527 U.S. at 675 ("[O]ur test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.") (internal punctuation omitted). The Court concludes that UIHC did not waive sovereign or eleventh amendment immunity as to claims under the ECPA and CFAA when it enacted the privacy policy. *See Delacruz v. State Bar of Cal.*, No. 16-CV-06858, 2017 WL 7310715, at *3 (N.D. Cal. June 21, 2017) (rejecting argument that state entity waived immunity by agreeing to website terms of use), *report and recommendation adopted*, No. 16-CV-06858, 2017 WL 3129207 (N.D. Cal. July 24, 2017).

### C. Congress Did Not Abrogate Sovereign Immunity When It Enacted the ECPA and CFAA.

The next questions are whether Congress abrogated sovereign immunity when it enacted the ECPA and/or CFAA and, if so, whether it "acted pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). If the answer to both questions is "yes," Yeisley's claims under those statutes may proceed despite the Court's conclusion that UIHC is an arm of the state and has not waived sovereign immunity. The Court concludes that the answer to the first question is "no" as to both the ECPA and CFAA and therefore need not reach the second.

To abrogate sovereign immunity, Congress must have "unequivocally expressed" an intent to do so. *Kimel*, 528 U.S. at 73. In earlier briefing—which, again, Yeisley incorporates by reference—she did not even respond to UIHC's argument that Congress did not intend to abrogate sovereign immunity when it enacted the ECPA and CFAA, much less point to any language

unequivocally expressing such an intent. The Court therefore continues to believe that Yeisley has waived the issue. *See Coney v. Union Pac. R.R.*, 136 F.3d 1195, 1196 (8th Cir. 1998) ("A party's failure to raise or discuss an issue in his [or her] brief is to be deemed an abandonment of that issue." (alteration in original) (quoting *Jasperson v. Purolator Courier Corp.*, 765 F.2d 736, 740 (8th Cir. 1985))).

The outcome would stay the same even if the Court reached the merits. As to the ECPA, Yeisley's best argument presumably would follow the logic of the North Carolina Court of Appeals in *Huber v. North Carolina State University*, which held that Congress intended to abrogate sovereign immunity when it enacted the ECPA. 594 S.E.2d 402, 406–07 (N.C. Ct. App. 2004). *Huber* reached this conclusion based on the history and evolution of the Federal Wiretap Act, which, when originally enacted in 1968, allowed claims only against a "person," not an "entity." *See id.* When Congress passed the ECPA in 1986, the statute was expanded to allow claims against an "entity" for the first time. *See id.* According to *Huber*, "by adding the word 'entity' to those against whom a suit could be pursued under [18 U.S.C. §] 2520(a), Congress could only have meant 'governmental entities,' inasmuch as the term 'person' already included business entities by definition." *Id.* at 406. "The addition of the language evinced a clear intent by Congress to abrogate the protections of sovereign immunity to the States." *Id.*

The Court agrees with the first part of *Huber*'s conclusion, but not the second. Most courts have held that Congress indeed intended to broaden the scope of the ECPA to allow claims against government entities when the word "entity" was added to 18 U.S.C. § 2520(a) in 1986. *See Adams v. City of Battle Creek*, 250 F.3d 980, 985 (6th Cir. 2001) ("Most courts addressing the issue have held that the 1986 amendments indicate that a governmental entity may be liable in a civil suit under the Act."); *Kemeness v. Worth Cnty., Ga.*, 449 F. Supp. 3d 1318, 1324 (M.D. Ga. 2020) ("[T]he majority view both nationwide and among our sister courts in this circuit is that Congress intended to make governmental entities liable with the 1986 amendment."). This does not automatically mean, however, that the statutory language "clearly demonstrates Congress' intent to subject the States to suit for money damages at the hands of [the plaintiff]." *Kimel*, 528 U.S. at 74; *see also Kemeness*, 449 F. Supp. 3d at 1322–26 (holding that amendments to ECPA broadened the scope of the statute but did not abrogate the state's sovereign immunity). In other words, unless Congress's intent when it added the words "entity" is unmistakably clear, the Court

cannot conclude that it intended to abrogate sovereign immunity even if the better reading of the statute is to allow claims against government entities.

To that end, the Court respectfully disagrees with *Huber*'s conclusion that the language of the 1986 amendment is sufficiently clear to abrogate sovereign immunity. Courts interpreting the ECPA disagree on whether it allows claims like Yeisley's against government entities for unlawfully intercepting communications. The Sixth Circuit says "yes." *See Adams*, 250 F.3d at 985. The Seventh Circuit says "no." *See Seitz v. City of Elgin*, 719 F.3d 654, 658–60 (7th Cir. 2013). The ambiguity reflected in these decisions raises serious doubts about whether the ECPA contains an unequivocal expression of intent to abrogate sovereign immunity.

The ambiguity arises because of the interplay between 18 U.S.C. §§ 2511(1) and 2520(a). The latter allows an aggrieved plaintiff to "recover from the person **or entity**, other than the United States, which engaged in that violation such relief as may be appropriate" (emphasis added). The former, however, makes it a violation only for "any person" to intercept, endeavor to intercept, or procure any other person to intercept wire, oral, or electronic communications. The words "or entity" were not added to section 2511(1). In *Seitz v. City of Elgin*, the Seventh Circuit concluded that this meant government entities were not subject to liability for intercepting communications, although they could be liable for other types of claims. 719 F.3d at 658–59. Other courts agree. *See, e.g.*, *Doe v. Fed. Dem. Repub. of Eth.*, 189 F. Supp. 3d 6, 14 (D.D.C. 2016). Most do not. *See, e.g.*, *Adams*, 250 F.3d at 985.

This Court need not resolve the ambiguity or decide which line of cases is more persuasive. Instead, for present purposes, what matters is simply that the ambiguity exists at all, as it undermines the argument that Congress unequivocally expressed an intention to waive sovereign immunity when it passed the ECPA. After all, "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (internal punctuation omitted).

The Court also sees another line of ambiguity in the ECPA that is equally significant to the sovereign immunity analysis. 18 U.S.C. § 2520(a) authorizes an aggrieved person to obtain "such relief **as may be appropriate**" (emphasis added). Pursuant to section 2520(b), available relief includes "(1) such preliminary and other equitable or declaratory relief **as may be appropriate**; (2) damages under subsection (c) and punitive damages **in appropriate cases**; and

(3) a reasonable attorney's fee and other litigation costs reasonably incurred" (emphasis added). The repeated use of the words "as may be appropriate" (or similar verbiage) is important, as it is well established that sovereign immunity does not preclude claims for damages against county and municipal government entities, nor does it bar claims against state officials for injunctive or declaratory relief. *See Alden v. Maine*, 527 U.S. 706, 756–57 (1999). Thus, when the ECPA authorized courts to award "appropriate" relief against an "entity," it may have been recognizing that the "appropriate" relief against local government entities would include damages while the "appropriate" relief against state government officials would not. In other words, Congress's repeated use of the word "appropriate" to describe the relief that may be awarded suggests an intention to leave the status quo alone as it relates to sovereign immunity. Damages claims against counties and municipalities, yes; damages claims against arms of the state, no. This interpretation gives effect to the Supreme Court's repeated admonition that sovereign or eleventh amendment immunity is abrogated only when Congress "unequivocally" says so. *Kimel*, 528 U.S. at 73.

The Court has located a handful of cases addressing sovereign immunity in the context of claims under the ECPA. In at least three instances, courts have held that sovereign immunity protects state agencies from such claims. *See Courser v. Mich. House of Reps.*, 831 F. App'x 161, 171 (6th Cir. 2020) (holding that ECPA claims were barred by sovereign immunity); *Kemeness*, 449 F. Supp. 3d at 1324 (same); *Fed. Univ. Police Officers' Ass'n v. Regents of Univ. of Cal.*, SAVC 15-00137, 2015 WL 13273308, at *8 (C.D. Cal. July 29, 2015) (same). The only case the Court can find that holds otherwise is *Huber*. 594 S.E.2d at 406–07. This Court will join the majority and hold that the statutory language of the ECPA lacks the clarity necessary to conclude Congress intended to abrogate sovereign immunity.

The Court reaches the same conclusion under the CFAA. The Court cannot find a single case holding that Congress intended to abrogate federal or state sovereign immunity when it enacted the CFAA, nor is there anything in the statutory language expressing an unequivocal intent to do so. By contrast, several courts have held that Congress did <u>not</u> intend to abrogate sovereign immunity when it enacted the CFAA. *See Dougherty v. U.S. Dep't of Homeland Sec.*, No. 22-40665, 2023 WL 6123106, at *4 (5th Cir. Sept. 19, 2023) (per curiam); *Micks-Harm v. Nichols*, No. 19-2173, 2021 WL 4699064, at *2 (6th Cir. May 24, 2021); *Garland-Sash v. Lewis*, No. 05 CIV. 6827, 2007 WL 935013, at *3 (S.D.N.Y. Mar. 26, 2007), *aff'd in part, vacated in part on other grounds*, 348 F. App'x 639 (2d Cir. 2009). This Court will do the same.

Because the Court concludes that Congress did not abrogate state sovereign immunity when it enacted the ECPA and CFAA, it need not decide whether Congress would have had the constitutional authority to make such an abrogation.

    *D.  Yeisley's Unjust Enrichment Claim Is Foreclosed by Sovereign Immunity.*

The final question is whether sovereign immunity also bars Yeisley's unjust enrichment claim. Numerous federal courts of appeals have held that sovereign immunity applies just as squarely to unjust enrichment claims as it does to other tort, contract, or quasi-contract forms of relief. *See United States v. $30,006.25 in U.S. Currency*, 236 F.3d 610, 614 (10th Cir. 2000) ("[N]or are we aware[] of any general waiver of sovereign immunity for unjust enrichment claims. Moreover, fairness or policy reasons cannot by themselves waive sovereign immunity."); *see also Fletcher v. La. Dep't of Transp. & Dev.*, 19 F.4th 815, 818–19 (5th Cir. 2021) (holding that sovereign immunity precluded unjust enrichment claims); *United States v. Craig*, 694 F.3d 509, 512–13 (3d Cir. 2012) (same); *Ho v. City of Boynton Beach*, No. 22-11542, 2023 WL 2293517, at *3 (11th Cir. Mar. 1, 2023) (per curiam) (same). The Eighth Circuit has essentially reached the same conclusion, holding that "[s]overeign immunity does not depend upon whether the government benefitted from its conduct in question." *United States v. $7,990.00 in U.S. Currency*, 170 F.3d 843, 845 (8th Cir. 1999). Based on this precedent, the Court concludes that Yeisley's unjust enrichment claim is barred by sovereign immunity.

The Court disagrees with Yeisley's argument that the Iowa Supreme Court held otherwise in *Endress v. Iowa Department of Human Services*, 944 N.W.2d 71 (Iowa 2020). The parties dispute the significance of Justice McDonald's partial concurrence and partial dissent in *Endress*, which expressed the view that sovereign immunity precludes unjust enrichment claims against the State. *Id.* at 94–95. The plurality in *Endress* simply held, however, that unjust enrichment was available as a "defense or offset" to a state agency's claim for recovery of overpayments made to a childcare provider. *Id.* at 80. *Endress* does not hold that a plaintiff can affirmatively recover from the State under an unjust enrichment or similar quasi-contractual theory, much less that the State has waived sovereign immunity as to such claims. Nor is the Court able to locate any other Iowa Supreme Court precedent reaching such a holding. At best, Yeisley cites *Ahrendsen ex rel. Ahrendsen v. Iowa Department of Human Services*, but there the Iowa Supreme Court held the plaintiffs could <u>not</u> recover from the State on an unjust enrichment theory for benefits they were not entitled to receive under federal or state statutes. 613 N.W.2d 674, 679 (Iowa 2000) (en banc).

While the Iowa Supreme Court did not rest its holding on sovereign immunity—which no one appears to have raised—*Ahrendsen* does more to undermine Yeisley's unjust enrichment claim than to support it.

In any event, Yeisley takes the position that her unjust enrichment claim arises under <u>federal</u> law, not Iowa law. (ECF 21, p. 15, n.4 ("[T]he unjust enrichment claim *here* alleges violation of federal law.")). If so, this creates more problems for her than it solves. It is impossible to conclude that Congress abrogated state sovereign immunity as to federal common law claims, as such claims arise only when Congress has not spoken on an issue. *See, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).[4] To put it another way, Congress cannot have clearly expressed its intent to abrogate sovereign immunity when it has not acted at all. *See Kimel*, 528 U.S. at 74.

Similarly, Yeisley does not explain how the State could be deemed to have waived sovereign immunity on federal common law causes of action, nor does she cite any case law adopting such a theory. Presumably her position rests on UIHC's privacy policy, but the Court has already explained above why the policy does not amount to waiver of sovereign immunity under the ECPA or CFAA. There is no reason to reach a different conclusion on her unjust enrichment cause of action. *See In re U.S. Postal Serv. Priv. Act Litig.*, No. MD08-1937, 2009 WL 2710261, at *5 (W.D. Wash. Aug. 25, 2009) (concluding that sovereign immunity foreclosed unjust enrichment claims arising out of U.S. Postal Service's alleged failure to protect the privacy of employee information); *cf. Davis v. Univ. of N. C. at Greensboro*, No. 19-CV-661, 2020 WL 5803238, at *5–6 (M.D.N.C. Sept. 29, 2020) (holding that sovereign immunity precluded state law unjust enrichment claim where plaintiff never alleged a valid contract).

---

[4] Federal common law claims also arise only in areas involving "uniquely federal interests." *See Boyle*, 487 U.S. at 504. Yeisley does not explain why her unjust enrichment claims would qualify.

## IV.     CONCLUSION.[5]

UIHC has met its burden of proving that it is an arm of the State and entitled to sovereign immunity. The Court further concludes that UIHC has not waived sovereign immunity in the circumstances presented here, nor did Congress abrogate sovereign when it passed the federal laws at issue. The Court therefore GRANTS UIHC's Motion to Dismiss for Lack of Jurisdiction. (ECF 37.) Yeisley's Amended Complaint is dismissed WITH PREJUDICE.

Dated: February 16, 2024.

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE

---

[5] Because the Court concludes that UIHC is protected by sovereign immunity, it will not address UIHC's arguments in the alternative for dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).